## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL WHITE, et al,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 19-cv-02797** |
| | ) | |
| **ILLINOIS DEPARTMENT OF STATE et al.** | ) | **Honorable Joan H. Lefkow** |
| | ) | **Judge Presiding** |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFFS' RESPONSE TO MOTION TO DISMISS

The plaintiffs, **MICHAEL WHITE ("White") and the ILLINOIS STATE RIFLE ASSOCIATION ("ISRA")** (together the "Plaintiffs"), by the Law Firm of David G. Sigale, and Gregory A. Bedell of Knabe, Kroning & Bedell, their attorneys, respectfully submit this Response to the Defendants' Motion to Dismiss.

### INTRODUCTION AND SUMMARY OF ARGUMENT

Michael White ("White"), a 43 year old man, has been twice denied a license to carry a concealed firearm (hereafter "CCL") because of *arrests* when he as 18 years old (1994) and 21 years old (1997), for *alleged* "gang affiliation" he denies under oath – *and which no agency could substantiate* – and for an arrest in 2012, the charges on which he demanded trial and was found not guilty. White sues to stop the unfair and unjustified denial of his Second Amendment right to bear arms. The ISRA likewise sues on behalf of similarly situated members to challenge constitutionally infirm aspects of the Firearm Concealed Carry Licensing Act, 430 ILCS 66/1 *et seq.* (the "Act").

In their Motion to Dismiss at this pleading stage, the Defendants try to defend the Act, and the decisions of the Concealed Carry Licensing Review Board (the "Board"), in the face of

an adjudicative process that: 1) does not permit access to the objecting party's primary source information; 2) provides no ability to discover what the Board considered and weighed in reaching its decision (despite being permitted to consider every aspect of the applicants life, no matter how distant an occurrence) 3) requires a complete response to objections in just 15 days; 4) does not permit the applicant to request a hearing before the Board (which would allow the applicant's character and demeanor to be evaluated by the tribunal); 5) applies the lowest evidentiary standard; and 6) ultimately permits the Board to issue a decision without providing findings of fact, which could be evaluated in the administrative review appeals process that the Defendants considers a pillar of the due process protections the Act affords. (Dkt 15 p. 8-9) This last is a blatant violation of State law (*See Medina Nursing Ctr., Inc. v. Health Facilities & Servs. Review Bd.*, 2013 IL App (4th) 120554, P24 (4th Dist. 2013).

It merits restating here: the above is the Defendants' process that denied White's enumerated fundamental Constitutional right to bear arms in self-defense.

Most telling of the level of respect the Defendants accord White's (and the ISRA members') Second Amendment right – and what belies the infirmity of the process - is the Defendants' response to Plaintiffs' criticism of the Act's imprecision: "It is clear if [White] stays out of trouble with law enforcement, the stronger his application will be." Dkt. 15 at p. 13. Besides missing the point entirely, this is no constitutional standard.

The Plaintiffs' Complaint properly alleges how the Act, and the decision of the Board, violate their Second Amendment right to bear arms and the Plaintiffs' right to due process of law under the Fourteenth Amendment. The Defendants' Motion to Dismiss should be denied.[1]

---

[1] The Plaintiffs accept the Defendants' position that the Illinois State Police and the Illinois Concealed Carry Licensing Review Board are in this case immunized state agencies under the Eleventh Amendment.

**ARGUMENT**

**Standard for Motion to Dismiss**

**F.R.Civ.P. 12(b)(6) Standard**

The Court "must accept as true all factual allegations in the complaint. *E.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007). Under the federal rules' notice pleading standard, a complaint must contain only a 'short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2). The complaint will survive a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'' *Ashcroft v. Iqbal*, 556 U.S. 662, _____, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Id.*" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012).

The Court should construe the complaint in the light most favorable to the plaintiffs accepting as true all well-pleaded facts alleged, and drawing all possible inferences in their favor. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

I.   **THE LEGAL STANDARD: ACCORDING TO *MOORE*, THE RIGHT TO BEAR OUTSIDE THE HOME IS AT THE "CORE" OF THE SECOND AMENDMENT**

The law of this Circuit is clear: the right to bear arms "is *as important* outside the home as inside." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012)(emphasis added). And is it now universally recognized that the right to keep and bear arms inside the home is a fundamental right at the "core" of the Second Amendment. *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008), *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010); *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2012) Given that the right to bear arms outside the home is at the core of the

Second Amendment, this Court must apply at least the "near strict scrutiny" test of *Ezell,* 651 F.3d at 701.

In *Ezell* the Seventh Circuit recognized *Heller's* requirement that any analysis of a government restriction on Second Amendments rights must be done under a "*heightened* standard of scrutiny" (emphasis in original). *Id.* Starting with the "core" aspects of the Second Amendment, *Ezell* stated that the level of scrutiny (with the *floor* of intermediate scrutiny) depends on the proximity of the government restriction to the "core" of the rights. It is instructive that the court began its analysis with *United States v. Skoien,* 614 F.3d 638 (7th Cir.2010)[2]. *Ezell* first noted *Skoien* applied intermediate scrutiny in upholding the prohibition of possession of firearms by persons convicted of a domestic-violence misdemeanor under 18 U.S.C. §922(g)(9). *Ezell* then found that level appropriate because "the claim was not made by a 'law abiding, responsible citizen' as in Heller." 651 F.3d at 708.

Turning to the City of Chicago ordinance, which, among other things, banned shooting ranges within city limits, the *Ezell* court found the right to maintain skill and proficiency by practicing at ranges to involve a "corollary to the meaningful exercise of the core of the right to possess firearms for self-defense." *Id.* This "corollary" was so important that the court determined "that a more rigorous showing than that applied in *Skoien* should be required, if not quite strict scrutiny." *Id*.

Applying *Ezell* here, if "corollary" range construction restrictions demand "more rigorous" scrutiny than the intermediate scrutiny afforded *convicted* domestic violence misdemeanants, then any law depriving the "core" right of bearing arms must receive more

---

[2] Before analyzing the appropriate level of scrutiny under the Second Amendment, the *Ezell* court engaged in a thorough analysis of First Amendment precedent and the level of scrutiny applied in that context, the court finding these precedents particularly relevant to the Second Amendment analysis. *Ezell*, 651 F.3d 706-08.

scrutiny than a corollary right, at the very least approaching strict scrutiny. *See also Culp v. Madigan*, 840 F.3d 400, 407 (7th Cir. 2016)(Judge Manion dissenting).[3]

Additionally, the Seventh Circuit recently stated "[t]he government has the burden 'of justifying its law under a heightened standard of scrutiny; rational-basis review does not apply.' [*Ezell*, 651 F.3d 703.] We have consistently described step two as "akin to intermediate scrutiny" and have required the government to show that the challenged statute is substantially related to an important governmental objective. *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) (citing cases)." *Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir. 2019).

The Defendants' argument that "intermediate scrutiny" should apply in this case (Dkt 15, p.8), is contrary to the directions of *Ezell*. Furthermore, its reliance on *Culp v. Raul*, 921 F.3d 626 (7th Cir. 2019) is misplaced because the focus of the case – denial of a CCL to non-Illinois residents – was the Defendants' claimed inability to verify a non–resident's ***threshold qualifications*** to possess a CCL, namely that the applicant not have a felony record or mental heath issues. This focus is confirmed by the manner in which the *Culp* court distinguished *Moore*, stating: "But neither *Moore* nor the Supreme Court's decisions in *Heller* and *McDonald* preclude a state from imposing criminal history and mental fitness limitations on gun possession. See *Heller*, 554 U.S. at 626, 128 S.Ct. 2783 ; *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020." *Id*

---

[3] "Whenever a law infringes on the right to bear arms for self-defense, that law must be at least substantially related to an important government interest. And a law that curtails the fundamental right of law-abiding citizens to carry a weapon for self-defense must pass even more exacting (although not quite strict) scrutiny. Defenders of such a law must show a "close fit" between the law and a strong public interest. *Ezell*, 651 F.3d at 708–09. That "close fit" is functionally equivalent to the "narrow tailoring" requirement for content-neutral speech restrictions to which strict scrutiny is inapplicable. *See, e.g.*, *McCullen v. Coakley*, ─── U.S. ───, 134 S.Ct. 2518, 2534, 189 L.Ed.2d 502 (2014) ; *see also Ezell*, 651 F.3d at 706–08 (discussing the adaptation of First Amendment precedent to Second Amendment cases). As in First Amendment cases, the tailoring requirement prevents government from striking the wrong balance between efficiency and the exercise of an enumerated constitutional right. *McCullen*, 134 S.Ct. at 2534."

at 654. Indeed, when considering the complete sentence of *Moore* Defendants cite in support of regulations that pass Second Amendment muster (Dkt 15 p.8), this is even more clear: "And empirical evidence of a public safety concern can be dispensed with altogether when the ban is limited to obviously dangerous persons ***such as felons and the mentally ill. District of Columbia v. Heller, supra, 554 U.S. at 626, 128 S.Ct. 2783.***" *Moore*, 702 F.3d at 940 (emphasis added to omitted portions).

The Defendants' reliance on *Kuck v. Danaher*, 822 F.Supp.2d 109 (D. Conn. 2011) can be dismissed for the similar reasons. First, *Kuck* itself is at odds with *Ezell*, relying instead on precedents that pre-date *Ezell* (only one of which is 7th Circuit precedent, which the *Ezell* court itself distinguished. 651 F3d. at 703). In addition, the cases on which *Kuck* relies dealt with individuals who committed criminal acts like pointing a *bazooka* at a neighbor or shooting at a neighbor's house, or who demonstrated mental illness through threatening to commit suicide by shooting himself. *See Kuck*, 822 F.Supp.2d at 129.[4] *Kuck* in this sense squares with *Skoien* but White is neither a felon nor someone with a mental illness. Indeed, White has continually lawfully possessed a Firearm Owners Identification Card ("FOID") pursuant to 430 ILCS 65/5, which would be impossible with a felony conviction or history of mental Illness. *See* Complaint ¶¶ 30, 34. Therefore, the Court should consider the process and reasons underlying the denials of White's CCL under "near strict scrutiny" if not strict scrutiny.

## II. THE COMPLAINT ALLEGES UNCONSTITUTIONAL BURDENS ON THE PLAINTIFFS' SECOND AMENDMENT RIGHT TO BEAR ARMS

**A. When the Court applies the proper level of scrutiny, the burden is on the Defendants to show a "close fit" between the Act and a strong public interest.**

---

[4] Other examples in *Kuck* of conduct subject to intermediate scrutiny involved similar unlawful conduct: possession of a gun with an obliterated serial number; a person subject to an order of protection; and possession of a firearm by a felon. *See* 822 F.Supp.2d at 126.

As noted above, at this stage of the case, the Plaintiffs' must only make a plausible claim that the Act and the Board's application of it burdens the Plaintiffs' Second Amendment right to bear arms. The burden then shifts to the Defendants to come forth with evidence that the burdens of the Act, as written and applied, have a "close fit" to a "strong public interest." The *Ezell* court described this "nearly strict scrutiny" analysis as follows, 651 F.3d at 708-09:

> To be appropriately respectful of the individual rights at issue in this case, the City bears the burden of establishing a strong public-interest justification for its ban on range training: The City must establish a close fit between the range ban and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights. Stated differently, the City must demonstrate that civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified.

> In the case at bar, the burdens on the Plaintiffs' right are different but the analysis remains the same.

1.   <u>The Defendants' Motion fails to justify the burdens on law abiding citizens.</u>

A critical aspect of the Act is that it establishes a "shall issue" licensing scheme. (*Cf. Kuck* which involved a "may issue" scheme.) Section 25 of the ACT, titled "Qualifications for a license," sets out clear and *objective* criteria (emphasis added):

> The Department **shall issue** a license to an applicant completing an application in accordance with Section 30 if this person:

>> (1) is at least 21 years of age;

>> (2) has a currently valid Firearm Owner's Identification Card and at the time of application meets the requirements for the issuance of a Firearm Owner's Identification Card and is not prohibited under the Firearm Owners Identification Card Act or federal law from possessing or receiving a firearm;

>> (3) has not been convicted or found guilty in this State, or any other state, of:

(A)     a misdemeanor involving the use or threat of physical force or
        violence to any person within the 5 years preceding the date of the
        license application; or

(B)     2 or more violations related to driving while under the influence of
        alcohol, other drug or drugs, intoxicating compound or
        compounds, or any combination thereof, within the 5 years
        preceding the date of the license application.

(4)     is not the subject of a pending arrest warrant, prosecution, or
        proceeding for an offense or action that could lead to disqualification to
        own or possess a firearm.

These *threshold qualifications* ensure that only *law abiding citizens* may be considered

for a CCL.  The FOID requirements "weeds out" applicants that have a felony and certain other

specified *convictions* or have not been *adjudicated* mentally disabled or involuntarily committed

to a mental health facility.  *See* 430 ILCS 65/4.  The Act adds to this disqualification for other

*convictions*, including misdemeanor level, for specified *violent* or drug related acts.  This

comports to the letter and spirit of *Heller, McDonald,* and *Moore* that, as the Defendants note,

accept bans that are "limited to obviously dangerous persons such as felons and the mentally ill."

*Supra.*

The Act strays from this constitutionally accepted burden on the Second Amendment

right when it allows the Board to *subjectively* evaluate law abiding citizens under the provision

of Section 10 of the Act, titled "Issuance of license to carry a concealed firearm."   While still

using "shall issue" language and recognizing that law abiding applicants have made it this far,

the Act permits denial of a CCL to law abiding applicants if the Board determines the applicant

should not have one.  Section 10 states, in relevant part:

(a) The Department shall issue a license to carry a concealed firearm under this Act
to an applicant who:

(4) does not pose a danger to himself, herself, or others, or a threat to public safety as determined by the Concealed Carry Licensing Review Board in accordance with Section 20.

The Plaintiffs' Complaint directly challenges application of this clearly subjective additional qualification to law abiding citizens.

The Defendants' efforts to justify the grant of such broad discretion under this undefined standard meet neither the "nearly strict scrutiny" nor intermediate standards. An examination of the arrests the Board claims it was permitted to consider in White's application reveal just how far the Board has and can stray beyond the boundaries of permissible burdens on law abiding citizens.

    a. <u>Consideration of 20 year old arrests</u>.

In response to law enforcement objections, the Board sought in 2017 information from White relating to arrests dating back to 1993. Complaint, Exhibit 1 (Dkt. 1-2) White provided responses, noting first that four of the arrests the Board raised occurred before he was 18 years old. Complaint Ex. 2 (Dkt 1-3, p.22) He explained that one arrest was for possession of cannabis ((Dkt 1-3, p.23, ¶23), and that another arrest was for possession of a folding Swiss Army like pocket knife (Dkt 1-3, p.23, ¶21). Other arrests, in 1993 and 1995, he did not remember.

Even accepting, *arguendo*, the improper standard, White's complaint alleges that these arrests cannot bear on whether *at the time of his application* (2017) he "*poses* a danger to himself, herself, or others, or a threat to public safety." The Defendants' theory flips the constitutional analysis on its head when they state that "the Second Amendment does not constitutionalize plaintiff's [sic] opinion that incidents dating back more than an unspecified number of years have *zero* probative value, such that the Board cannot even *consider* them without violating the Second Amendment;" and similarly "[n]othing in the Second Amendment

constitutionally prohibits the Board [from] considering arrests going back a certain number (unspecified by plaintiffs) of years." Dkt 15, p. 16-17 (emphasis in original). Under either a "close fit" or even "substantially related" standard, the burden to justify the restriction is on the government, not the other way around. *Kanter*, 919 F.3d at 442.

More seriously, the Defendants must be called to answer with evidence how the Board's latitude to consider any and all arrests with no temporal restriction does not work a lifetime ban which, Plaintiffs submit, is a categorical type ban rejected in *Heller*. The Defendants' defense here, "It is clear if [White] stays out of trouble with law enforcement, the stronger his application will be," Dkt 15, p. 13, is no defense at all. White and those similarly situated cannot change history; prior arrests are permanent. Moreover, staying out of trouble is not the point; the issue is rehabilitation; what can White do or how long must he wait till the Board ignores 20 year old arrests? The direct challenge to the discretion the Board claims under the Act, as alleged in the Complaint, states the Plaintiffs' claim of an unconstitutional burden on their Second Amendment right to bear arms.

      b.    <u>Consideration of non-violent arrests.</u>

As noted, several arrests were substantively non-violent. Possession of cannabis is clear. And indeed mere possession of a folding pocket knife – in one's pocket - is not violent. The Complaint challenges the burden placed on the Plaintiffs Second Amendment right to bear arms where the Board is allowed to consider arrests for non-violent crimes.

In contrast, the Defendants' citations to *Perez v. Illinois Concealed Carry Licensing Review Board*, 2016 IL App (1st) 152087 (1st Dist. 2016) and *Jankovich v. Illinois State Police*, 2017 IL App (1st) 160706 (1st Dist. 2017), are more persuasive in White's favor, and revealing about Defendants' attitudes, than supportive of the State's CCL scheme.

In *Perez*, the Court noted:

> Here, the Board had sufficient evidence of plaintiff's criminal history. Plaintiff's criminal background included the 2007 domestic battery, the 2011 aggravated assault, 2003 charges for criminal trespass to a vehicle and driving without a license, and a 2001 juvenile arrest for assault. . . [t]he police report for the domestic battery disclosed that plaintiff's girlfriend informed officers that plaintiff struck her on her head, face, and body after a verbal argument. The report noted that the officers observed minor bruising around the victim's eye and leg. Plaintiff did not offer a statement refuting or explaining the evidence against him.

Perez, 2016 IL App (1st) 152087 at *P22. This is nothing like White's situation; there is nothing violent in his record, and he explained all evidence against him.

Further, in *Jankovich*, the Court found that plaintiff "did next to nothing to challenge the strength or soundness of the Board's finding of dangerousness below." *Id.* at *P73. And compared to what was in his record, his two sentence non-response seemed particularly glaring: "the Board had been presented with information from two law enforcement agencies that plaintiff was alleged to have committed the following acts: (1) he threatened to put an individual 'in a wood chipper and six feet underground' if that individual did not stop bothering plaintiff about an issue concerning money in 2012; (2) he threatened to 'bust [a man's] head open and 'break [his] legs' for damaging some of plaintiff's campaign signs in 2011; (3) he kicked and punched an individual with brass knuckles in 2010; and (4) he had been arrested 18 times, including a 1992 conviction for criminal damage to property and arrests for assault and for battery." *Id.* at *P76.

And even so, the *Jankovich* Court noted that the plaintiff:

> plaintiff could have said in response, for example, that he did not commit any of these acts, that he was utterly innocent. He could have said that some or all of these incidents were accompanied by specific circumstances that mitigated his actions or absolved him entirely. He might have explained that the alleged victims had ulterior motives—grudges or reasons to fabricate their stories. He could have submitted the names of, if not affidavits or statements from, eyewitnesses who would exonerate him. He might have made the case that the past was the past, that

11

he was a changed man. He could have done any number of things to attempt to convince the Board that he did not, at this time, "pose[ ] a danger to himself *** or others" and that he was not "a threat to public safety." 430 ILCS 66/20(g) (West 2014).

*Id,* at *P78. But White did all these things to no avail, belying the notion that redemption comes with either the passage of time or a good explanation. White's record is not on the same planet as in *Jankovich*, but with near complete discretion handed to the Board, and an abuse of discretion standard facing a turned-way applicant under the Illinois Administrative Review Act, it is clear that almost any alleged offense, regardless of age, severity, or lack of conviction (as discussed below), is enough to get an applicant denied by the Review Board.

 c. <u>Consideration of arrests when found not guilty</u>.

 The Defendants point to White's 2012 arrest for unlawful use of a weapon as more current support for the Board's decision. Yet, the Defendants gloss over that White chose to go to trial on these charges and was acquitted. White further denied under oath the allegations of the charges. Complaint, Exhibit 2, Dkt 1-3, p.22, ¶¶17-19. The Defendants state generally that "acquittal does not demonstrate a defendant's innocence," Dkt 15, p. 16, but equally an arrest does not demonstrate guilt. Indeed, ignoring the distinction between an arrest – no less an acquittal - and a conviction erases the line created in the Act and statutes, like 18 U.S.C. §922(g)(1) (prohibiting felons from possessing firearms), a statute on which the Defendants remarkably – yet erroneously - draw on for support. (Dkt 15 p. 17.) Second Amendment jurisprudence clearly recognizes the line between felons or violent misdemeanants and others who without such convictions are law abiding citizens. As FOID holders, Plaintiffs cannot rationally be considered anything less.[5]

---

[5] That a CCL applicant can be designated "a danger to himself, herself, or others, or a threat to public safety" yet still qualify for a FOID, which permits purchase and home possession, as well

    d.    <u>There is no meaningful right to review</u>.

It is entirely rational, after reading the above, to ask "how do you know the Board considered the cannabis arrest, the pocket knife arrest or any other arrest from 20 years ago." The short answer is we don't; and aye, there's the rub. As shown in Complaint Exhibit 3, Dkt. 1-4, neither the letter from the Illinois State Police nor the Board's "Final Order" provide any findings of fact, conclusions of law or other explanation identifying what evidence it considered, what is discounted, what weight it gave to White's affidavit or any other aspect – including the allegation of "gang affiliation" discussed more below. While the Board's findings of fact are given deference, they are subject to reversal if they are against the manifest weight of the evidence. *Comprehensive Community Solutions Inc. v. Rockford School Dist. No. 205*, 216 Ill.2d 455, 471-72 (2005). Furthermore, as the Illinois Supreme Court cautioned, "[e]ven under the manifest weight standard applicable in this instance, the deference we afford the administrative agency's decision is not boundless." *Kouzoukas v. Retirement Board*, 234 Ill.2d 446, 465 (2009), quoting *Wade v. City of North Chicago*, 226 Ill.2d 485, 507. The Final Order, however, presented no information for a reviewing court to gauge the justifiability of the Board's decision.

    e.    <u>The Board's distinction and experience is necessary but not sufficient.</u>

The Defendants correctly note the composition of the Board and the perspective and experience the members bring to their decisions. However, a blanket grant of discretion to a panel of experts regardless of distinction not allowed. If experience, unguided by statutory constraints, are the basis for a administrative decision, it amounts to the court referred to as the impermissible "private conceptions" in *People v. Garrison*,

---

as out-of-the-home transport, of a firearm and ammunition, raises serious questions about the rationality of this designation, more than suggesting it is arbitrary and capricious as well as subjective.

412, N.E.2d 483, 488 (1980); *see also Grigolet Co. v. Pollution Control Board*, 245 Ill.App.3d 337 (4th Dist 1993)(agency belief that it is ultimate authority is "untenable."); *See also, City of Aurora v. Navar*, 210 Ill.App.3d 126 (2d Dist. 1991)("Reliance on the unbridled discretion of administrative officials fosters the arbitrary and discriminatory enforcement which is prohibited by both the State and Federal Constitutions.")

  f.  <u>The cabin on which the Defendants rely is riddled with holes.</u>

  The Defendants argue, p. 10, that "[n]othing in the Second Amendment forecloses the Illinois General Assembly from affording *some* discretion to the Board when it decides whether a particular applicant poses a danger to himself or others." (Emphasis in original.) While again flipping the analytical burden, the premise of the statement is wrong; the Act doesn't grant the Board "*some*" discretion but, as shown above, the Act grants the Board substantial discretion unbounded by statutory guidance or other restrictions: what it can consider in terms of type and gravity of any arrest or other act or condition is ungoverned; what it considers in terms of when an act occurred or condition existed is ungoverned; whether an applicant will receive a hearing is entirely at the Board's discretion (unlike in *Kuck* where is was required by statute); and the credibility determinations, as well as the weight given evidence, are unreviewable because the Board is not required to make *and publish* any particular findings or conclusions, other than the ultimate conclusion that an applicant poses a threat or danger. The Plaintiffs' Complaint calls on the Defendants to answer and provide evidence demonstrating why this discretion the Act grants to the Board, with which it may deny a CCL to a law abiding citizen, is a "close fit" or even "substantially related" to the Defendants' public safety concerns.

  g.  <u>Objections based on, and the Board's reliance on, gang affiliation are abhorrent.</u>

Perhaps the most insidious of all infirmities inherent in the Board process and procedure permitted by the Act is the use of the "gang database." The Complaint quotes the Chicago Police Department's ("CPD") objection to White's second CCL application that alleged, in relevant part: "In support of the objection, be advised …. The applicant is identified in the Chicago Police gang database as a member of the Latin Soul street gang." Complaint, ¶44. As noted above, it is impossible to know whether and to what extent the Board relied on this objection but it is beyond probable that the Board gave it significant weight given a) the fact that the CPD maintains such a database; b) it saw fit to use White's inclusion in the database as an objection; and c) the objection included the following embellishment: "The criminal activities of street gangs posed a substantial threat to safety and quality of life of the residents of Chicago."

But, as noted in the Complaint, White swore under oath that he was not a member of the Latin Souls gang, but could not further explain directly to the Board, as he was denied a hearing. Complaint, ¶46, Exhibit 2, Dkt 1-3, p. 23-4. White even tried to contest his inclusion in the database, submitting an FOIA request to both the CPD and the Cook County Sheriff, but was denied information substantiating the CPD's claim. *Id.* The weight the Board gave to White's sworn disavowal cannot be known, given the summary denial of his CCL. In all events, White was unable to contest – to "prove the negative - neither by direct testimony to the Board nor with evidence from the CPD, the gang allegation.

Yet, the CPD's gang database is now openly notorious. Indeed the City of Chicago Officer of the Inspector General was tasked to investigate the gang database and concluded in its "Review of Chicago Police Departments 'Gang Database'":

> CPD's gang information contains incomplete and contradictory data. OIG's analysis of data from CPD's Gang Arrest Cards found numerous instances in which individuals are listed with blank or conflicting Identification Record numbers, birthdates, and other classifications. OIG identified records in which

individuals had birth dates prior to 1901, and other records in which an individual's age was listed as zero. Over 15,000 individuals designated as gang members had no specific gang membership listed and no reason provided for why the individual was listed as a gang member. Individuals designated as gang members are not notified of their designation an have no ability to appeal the designation. CPD does not regularly review, correct, or purge inaccurate gang information; those with inaccurate designations have no opportunity to clear their name and mitigate the impact of incorrect or outdated gang designations. Ultimately, CPD's gang designations are permanent and inescapable. Once designated, an individual is listed as a gang member in CPD's systems forever.

Additionally, some entries in the "gang database" raise serious concerns about how CPD officers perceive and treat the people with whom they interact. OIG found that CPD officers entered occupations for individuals on gang arrest cards that included "SCUM BAG," "BUM," "CRIMINAL," "BLACK," "DORK," LOOSER," (*sic*) and "TURD." Such entries demonstrate CPD's lack of controls around its data entry practices and how such information systems can be employed to demean and dehumanize members of the public

The above quoted summary, contained in the initial pages of the report, is attached hereto as Exhibit 1 to this Response, of which this Court may take judicial notice as a public record under Federal Rule of Evidence 201. *See Laborer's Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 607 (7th Cir 2002). The entire report can be found at:

https://assets.documentcloud.org/documents/5816977/OIG-CPD-Gang-Database-Review.pdf.

In addition, there is currently pending in the United States District Court for the Northern District of Illinois a class action suit against the City of Chicago and the Superintendent of the CPD alleging violations arising from the CPD "gang database" of the class members' constitutional rights afforded by the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. §1983. Plaintiff White is a member of the defined class. A copy of the complaint in this case, 1:18-cv-04242, is attached to this Response as Exhibit 2, of which this Court may take judicial notice as a public record under Federal Rule of Evidence 201. *Scherr v Marriott Int'l., Inc.,* 703 F.3d 1069, 1073 (7th Cir. 2013).

As relevant to this case, the Plaintiffs have made more than plausible allegations that the Act and the Board's unconstrained discretion in the process, as demonstrated by its considering irrelevant and ancient history, and White's inclusion in the "gang database," unconstitutionally burden their Second Amendment right to bear arms. The Defendants should be called to answer and provide evidence demonstrating why the Board's use and probable reliance on evidence so demonstrably lacking in credibility is a "close fit" or even "substantially related" to the Defendants' public safety concerns.

## III.    THE PLAINTIFFS' COMPLAINT STATES A DUE PROCESS CHALLENGE

"Under the Due Process Clause of the Fourteenth Amendment, no State shall 'deprive any person of life, liberty, or property, without due process of law.' The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights." *Obergefell v. Hodges*, 135 S.Ct. 2584, 2697 (2015) (citing *Duncan v. Louisiana*, 391 U.S. 145, 147-149 (1968)).

"To demonstrate a procedural due process violation, the plaintiffs must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.'" *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004) (quoting *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993)).

"Due process 'is not a technical conception with a fixed content unrelated to time, place[,] and circumstances[;]' instead, it 'is flexible and calls for such procedural protections as the particular situation demands.' *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citations omitted). The process constitutionally required is determined by balancing three distinct factors:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of additional or substitute
> procedural safe-guards; and finally, the Government's interest.

*Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997) (quoting *Mathews*, 424 U.S. at 335).

The private interest affected by the Act and the Board's actions is great – Plaintiffs are deprived of fundamental Second Amendment rights and the ability to defend their lives. Further, there is no process or procedure to rectify the situation except for Court intervention, because the Act enables the shadow process which White cannot rebut or even fairly respond.

The Plaintiffs outlined above how the Complaint pleads numerous unconstitutional burdens that the Act and the Board's unconstrained discretion in the process impose. These alleged burdens also state plausible claims for violation of the Plaintiffs' right to due process of law under the Fourteenth Amendment to the United States Constitution.

**A.      The Act's undefined subjective standard of "threat" or danger," and the lack of objective criteria to guide the Board's consideration of evidence, violate the Plaintiffs' right to due process of law.**

Due process of law requires that a statute must not be "so vague that men of common intelligence must necessarily guess at its meaning or application."  *Smith v. Goguen*, 415 U.S. 566 (1974); *Grayned v. City of Rockford*, 408 U.S. 104 (1972).  More critical for the base at bar, "the statute must provide *sufficiently definite standards* for law-enforcement officers and triers of fact *that its application does not depend merely on their private conceptions*."  *People v. Garrison*, 412 N.E.2d 483, 488, 82 Ill.2d 44 (1980)(emphasis added), citing *Grayned* 408 U.S. at 108-09 ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) quoting *Smith v. Goguen*, 415 U.S. 566, 574, (1974)("the most important aspect of the vagueness doctrine 'is not actual notice, but * * * the requirement that a legislature establish minimal guidelines to govern law enforcement.'").

18

In *In re Torski C.*, 918 N.E.2d 1218 (4th Dist. 2009), the Appellate Court found a statute's definition of "dangerous conduct" unconstitutionally vague.  The court there considered the statute that provided for involuntary committal of an individual if a court found the person exhibited "threatening behavior" or "conduct that places another individual in reasonable expectation of being harmed."  405 ILCS 5/104.5.  After a thoughtful review of the due process of law considerations, the provisions and procedures of the Mental Health Code, and the legitimate safety objectives of involuntary committal, the court concluded, 918 N.E.2d at 1231:

> Given the lack of sufficient guidance in the definition, the foreseeable result of arbitrary interpretation and application by the governmental authorities leads this court to conclude that the definition set forth in section 1-104.5 of the Mental Health Code [citation omitted], does not satisfy constitutional standards and must be declared void.

The Complaint alleges due process of law violations because the Act uses terms very similar to those found lacking in *Torski*.  A CCL applicant cannot know from reading the Act if one arrest will cause denial; the applicant cannot know from reading the Act if there is a particular type of arrest that may cause denial; the applicant cannot know from reading the Act whether the passage of one year, three years, five years or even ten years will mean a difference to the Board in terms of its determination that the applicant *is* a threat or a danger.   Would White qualify now?  For White, three years was not enough; how much longer must he wait?  Is White forever barred?  The Act does not answer these questions; it is *fully* in the discretion of the Board.   This does not pass constitutional muster.  *See  Smith v. Goguen*, 415 U.S. 566; *People v. Garrison*, 412 N.E.2d 483, 488; *City of Chicago v. Morales*, 527 U.S. 41 (1999).

As alleged in the Complaint, the unbounded power the Board assumes under the Act treads further on due process of law when viewed in light of the fact that an applicant, like White, does not have the right to test at an evidentiary hearing any serious accusation, such as

White is a gang member. Only the Board has the right under the Act to call a hearing, which it may *further* limit to "circumstances that cannot be resolved to the [Board's] satisfaction through written communication with the parties." Administrative Code of Illinois, Title 20, Section 2900.140 (c); 435 ILCS 66/20(e). Thus, the Board gets to decide if there will be a hearing; and, it gets to decide on what issues it believes it does not have enough information. As noted below, the gang finding, then would (and did) become a binding and virtually unreviewable finding of fact based on only a preponderance of the uncontestable evidence.

*Jankovich v. Ill. State Police*, 78 N.E.3d 548 (1st. Dist. 2017), on which the Defendants rely, is not on point. There, the appellate court specifically noted that the plaintiff failed supply any information refuting or explaining prior arrests. 78 N.E.2d at 562. This vitiated this his claim. Here, White provided specifics to allay the Board's concerns, even in relation to arrests over 20 years old. Indeed, White said he was innocent with regard to the 2012 unlawful use of a weapon arrest, something the *Jankovich* court found would have been significant. *Id* at 563.

*Kuck* is equally unavailing here because the bases of the standards in the two statutes are different. First, the Connecticut statute at issue in *Kuck* provided for a hearing; the Act gives the Board complete discretion in convening a hearing and dictating what issues would be considered. The Connecticut statute was also tethered to felonies, as shown above. In addition, the state precedent on which the District Court relied to find the term "suitable" had a "clear definition" is suspect, the *Kuck* court declaring "it has long been established that a person is not 'suitable' to carry a firearm if he lacks the 'essential character or temperament necessary to be entrusted with a (lethal) weapon," citing *Dwyer v. Farell*, 193 Conn. 7, 12, 475 A.2d 257 (1984). Plaintiffs respectfully submit that the phrase "essential character or temperament" gives no clarity whatsoever to who is "suitable." *Kuck*, 822 F.3d at 133.

The Act, to the contrary, is boundless in the discretion is give the Board; here, a mere arrest for possession of cannabis could have been the basis for White's denial. That we don't know if it was is yet additional proof that the process countenanced under the Act is far from due process of law.

This violates Illinois law, fundamental fairness, and due process.

> "[I]f the requirement of findings means anything, it must compel administrative agencies adequately to articulate the bases of their action, showing a rational connection between the facts found and the choice made." [citation omitted] The grounds of the administrative decision must be "'adequately sustained,'" that is, by a reasoned explanation. *Reinhardt*, 61 Ill.2d at 103 (quoting *Chenery Corp.*, 318 U.S. at 94). "'The necessity for administrative agencies to provide a statement of reasons *** is a fundamental principle of administrative law.' [citation omitted] Due process requires the administrative decisionmaker to 'state the reasons for his determination."

*Medina Nursing Ctr., Inc. v. Health Facilities & Servs. Review Bd.*, 2013 IL App (4th) 120554, P24 (4th Dist. 2013).

In *Medina Nursing*, the Court also held: "We decline to supply a theoretical justification of the Board's decision, even at the invitation of the Board's attorneys. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962). In supplying such a justification, we effectively would be making factual findings and judgment calls that the Board alone should make, attributing them to the Board in a speculative way (*e.g.*, "the Board could have found," "the Board might have reasonably decided")." *Medina Nursing*, 2013 IL App (4th) 120554 at P26.

Just as in *Medina Nursing*, it is impossible to know why the Board found as it did, and it would be improper for the Court to guess. *See Lucie B. v. Dep't of Human Servs.*, 966 N.E.2d 1005 (2d Dist. 2012) ("[W]hile an agency is not required to make a finding on each evidentiary fact or claim, its findings must be specific enough to permit an intelligent review of its

decision"). Without any actual findings of fact, it leads only to the conclusion that the Board

acted arbitrarily. *See Roman v. Cook County Sheriff's Merit Bd.*, 2014 IL App (1st) 123308, P83

(1st Dist. 2014) ("[I]f, due to the inadequacy of the Board's decisions [the] evidence is unclear,

we will hold it against the Board.")

These due process of law deficiencies, which are alleged in the Complaint, state plausible

claims for the relief Plaintiffs seek.

**B.      The Act's of the preponderance of the evidence standard violates the Plaintiffs'
right to due process of law.**

The Supreme Court "has mandated an intermediate standard of proof—clear and

convincing evidence—when the individual interests at stake in a state proceeding are both

particularly important and more substantial than mere loss of money." *Santosky v. Kramer*, 455

U.S. 745, 756 (1982) citing *Addington v. State of Texas*, 441 U.S. 418, 433 (1979). In

*Addington*, the Court evaluated a "dangerous" determination indistinguishable from that

involved in this instant case. The *Addington* Court held that the clear and convincing standard of

proof is ideally suited to the sort of factual findings and inferences necessary for the dangerous

determination required in an involuntary commitment on mental health grounds. *Id*. at 425-33.

Leaving such a determination to a mere preponderance of the evidence risks permitting a

substantial deprivation of liberty "based solely on a few isolated instances of unusual conduct

[or] idiosyncratic behavior." *Id*. at 427.

In this case, the Second Amendment right is "among those fundamental rights necessary to

our system of ordered liberty," *McDonald*, 130 S. Ct. 3042. Indeed, this right is not "extended"

by the Act or even the Second Amendment, as the court suggests in *Moustakas v. Margolis*, 154

F.Supp.3d 719, 731(N.D.Ill. 2016); rather it is an *inherent natural right* "secured" by the Second

Amendment. The Seventh Circuit in *Ezell* understood the proper place the right to keep and bear

arms holds, noting that the Supreme Court found that "the Second Amendment secures a pre-existing natural right to keep and bear arms." 651 F.3d at 700-01. In addition, as *Moore* held, the right to carry a concealed weapon is as important as the "core" right to possess a firearm at home for self-defense. 702 F.3d at 94. This is obviously "particularly important and more substantial than mere loss of money." *Santosky, supra.*

It must be noted that, in addition to misapprehending the importance of the Second Amendment right to bear arms, the court in *Moustakas* dealt with a situation where the applicant had not availed himself of the new procedures implemented to cure some, but not all, of the procedural failings of the Act as originally adopted; he chose instead to challenge the Act in the District Court. This is important because the court there was not faced with the stark failings of the system, as raised by the Plaintiffs' Complaint. Dealing in the abstract, the court felt the Act satisfied due process because "an applicant has an opportunity to show why he does not pose a danger to himself or the public and can further seek full appellate review, which offers safeguards against an erroneous decision by the Board that is available to all applicant. This is clearly an adequate post-deprivation remedy." 154 F.Supp.3d at 731. The Court could not foresee that the Board would rely on unchallengeable objections like the gang database and that the Board would not state its reasoning or findings, thus rendering the appellate review nearly meaningless. Accordingly, the Defendants' reliance on this case is misplaced.

## IV. WHITE'S VAGUENESS CLAIM IS NOT BARRED BY RES JUDICATA

The one aspect of White's claims, that the Act confers unbridled discretion on the Board and unconstitutionally vague, is not barred by *res judicata*, as the Defendants claim (Dkt 15, p. 6). As noted in *Huon v. Johnson & Bell, Ltd.*, 757 F.3d 556, 558 (7th Cir. 2014) (quoting *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302, 703 N.E.2d 883, 889 (1998)), Illinois's

law of claim preclusion imposes three requirements for claim preclusion to apply: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." It is the defendants' burden to establish *res* judicata applies to a claim. *Hernandez v. Pritikin*, 981 N.E.2d 981, 993 (2012); and, under Illinois law, doubts about the application of claim preclusion should be resolved against application of the doctrine. *Welch v. Johnson*, 907 F.2d 714, 720 (7th Cir. 1990). Most relevant here, where a second "transaction" occurs, arising after a previously litigated claim, the claims related to that second transaction are not barred. *Id.* at 723 (claim of discriminatory discharge arising after claim of discrimination in promotion not barred).

In this case, White is challenging the denial of his second application, submitted to the Defendants in 2017, three years after his first application submitted in 2014. *Cf.* Complaint ¶ 30 with ¶33, *et seq.* This difference is particularly significant in relation to White's vagueness claim because the Act's lack of temporal restriction or guidelines of any sort allow the Defendants to rely on one arrest *in perpetuity* as the basis of denial. The Defendants' interpretation of the Act allows the Board to consider everything, but reveal nothing about its decision, in denying a CCL. As a result, White's 1994 arrest for possession of cannabis could forever bar him from obtaining a CCL. Under the Defendants' application of *res judicata,* the denial is in cement and could never be challenged. Indeed, the Defendants suggestion, "if [White] stays out of trouble with law enforcement, the stronger his application will be," is even more hollow as denial of any future application would be forever unreviewable because it is potentially based on the 1994 arrest. White's challenge to this permanent barred raised by denial of his second application is clearly a second transaction presenting separate issues and is not barred.

24

Finally, the Plaintiff Illinois State Rifle Association was not a party or otherwise in privity to White's previous litigation over the 2014 application and denial, and therefore *res judicata* does not apply to it or its members.

## CONCLUSION

For the reasons set forth above, the Plaintiffs respectfully submit that their Complaint plausibly states claims against the Defendants for violation of their Second Amendment right to bear arms and for deprivation of their right to due process of law under the Fourteenth Amendment.  The Defendants' Motion to Dismiss should be denied.

Dated: October 18, 2019                                     Respectfully submitted,

                                                           By: _/s/Gregory A. Bedell_____
                                                                 One of the Attorneys for Plaintiff

Gregory A. Bedell (Atty. ID# 6189762)
Knabe, Kroning & Bedell
20 South Clark Street, Suite 2301
Chicago, Illinois 60603
312.977.9119
gbedell@kkbchicago.com

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com