IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL WHITE, et al. | ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Case No.: 19-cv-02797 ) ) Hon. Joan H. Lefkow ) |
| ILLINOIS STATE POLICE, et al. | ) ) |
| Defendants. | ) ) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

Plaintiffs Michael White, an unsuccessful applicant for an Illinois concealed carry license, and the Illinois Rife Association, have filed a scattershot complaint alleging that the Firearm Concealed Carry Act, 430 ILCS 66/1 *et seq.*, is unconstitutional in several respects. Defendants established in their opening brief that plaintiffs' claims are baseless and should be dismissed, and plaintiff's response confirms as much.

**I.     THE ILLINOIS STATE POLICE AND THE ILLINOIS CONCEALED CARRY LICENSING REVIEW BOARD ARE NOT PROPER DEFENDANTS.**

Plaintiffs agree that their claims against ISP and the Board are barred by the Eleventh Amendment. (Dkt. No. 15 at 5-6, Dkt. No. 21 at 2 n.1)

**II.    THE ACT'S DANGEROUSNESS STANDARD DOES NOT GIVE THE BOARD "UNBRIDLED" DISCRETION AND IS NOT UNCONSTITUTIONALLY VAGUE.**

Plaintiffs' first theory of liability, claiming that the Act's "dangerousness" standard, 430 ILCS 66/20(g), gives the Board "unbridled discretion" and is unconstitutionally vague, does not state a valid claim. (Dkt. No. 15 at 6-14)

1

**White's Claims are Barred by Res Judicata**

To start, defendants established in their opening brief that White's claims alleging that the Act vests the Board with too much discretion are foreclosed by res judicata. (Dkt. No. 15 at 6-7) White raised the same "unbridled discretion" claim that he presents here in connection with his first concealed carry application, and the Illinois Appellate Court rejected it. (*Id.*) White responds that res judicata does not apply because he is now "challenging the denial of his second application, submitted to the Defendants in 2017, three years after his first application submitted in 2014." (Dkt. No. 23 at 24) He claims that if res judicata applies, "the denial is in cement and could never be challenged." (*Id.*) He says that a 1994 arrest for cannabis possession "could forever bar him from obtaining a CCL." (*Id.*)

White's concerns are misplaced. White's "unbridled discretion" claim challenges the constitutionality of the Act itself. (Dkt. No. 1 at ¶¶56, 61 (alleging that "the FCCA" vests the Board with "unbridled discretion")) And White has already litigated and lost his challenge to the Act in state court; there is no reason why he should be allowed to re-litigate the same claim here. Contrary to White's assertion, applying res judicata here would not "cement" the Board's prior denial of his application, nor would it "forever bar" him from obtaining a concealed carry license. (Dkt. No. 23 at 24) Under the principles of res judicata, White's present federal claim challenging the Act is foreclosed, but he remains free to apply again for a concealed carry license. In the event that White applies again and the Board is called upon to assess whether he is dangerous, see 430 ILCS 66/20(g), the Board will make that assessment anew, based on the evidence before it at the time of the decision. This Court's application of res judicata here, to White's claim challenging the constitutionality of the Act, would not prevent the Board from granting White a license if he applies again and qualifies.

In his brief, White sets out the three elements for res judicata—a final judgment on the merits, an identity of cause of action, and an identity of parties or their privies—but is unable to refute that they are met here. (Dkt. N. 23 at 24, Dkt. No. 15 at 6) White's argument appears to contest the second prong ("identity of cause of action"). He cites to *Welch v. Johnson*, 907 F.2d 714, 723 (7th Cir. 1990), which is easily distinguishable. In *Welch*, a former DCFS employee filed a federal suit alleging various instances of harassment and improper denial of a promotion. *Id.* at 716. Shortly thereafter, the employee was discharged; she appealed her dismissal to the Illinois Civil Service Commission, which found the discharge warranted, and the Circuit Court affirmed this finding on administrative review. *Id.* at 716-717. In the federal case, the defendants asserted a res judicata defense based on the state proceedings. The Seventh Circuit held that the employee's federal claims relating to the alleged harassment were barred by res judicata, while her federal claims relating to the denial of a promotion could go forward. *Id.* at 723. The promotion claim was a "separate cause of action" from the state discharge review proceedings (hence, the second requirement for res judicata was not satisfied) because the employee was denied a promotion before almost all of the alleged acts that led to her discharge, and therefore "the majority of events that formed the proof in the discharge proceeding" would "not be relevant" to the employee's federal promotion claim. *Id.*

*Welch* is inapposite. Unlike *Welch*, where the question was whether the plaintiff *should have* raised her promotion claim in her state court proceedings, White *did* raise his "unbridled discretion" claim in his state court case, because he understood (again, unlike *Welch*) that it was relevant to the case. Plaintiffs' prior (state) and present (federal) constitutional claims alleging that the Act gives the Board "unbridled discretion" are identical causes of action, so res judicata

3

applies. Compare *White v. Ill. Dep't State Police-Firearms Service Bureau*, 2017 WL 2602637, at *8 (Ill. App. 1st Dist. Jun. 14, 2017) and Dkt. No. 1 at ¶¶56, 61.

### **Plaintiffs' Second Amendment Claim Fails**

Plaintiffs' claims also fail on the merits. The appropriate standard of review is intermediate scrutiny. (Dkt. No. 15 at 7-8) Plaintiffs' argument for application of "near strict" or strict scrutiny misreads the case law. (Dkt. No. 23 at 3) Plaintiffs note, correctly, that the right to keep and bear arms *inside the home* is at the "core" of the Second Amendment. (*Id.*) But then they wrongly assert that the right to bear arms *outside the home* is also at the core of the Second Amendment, citing to *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). (*Id.*) *Moore* offers no support for plaintiffs' position. There, the Seventh Circuit held that Illinois's prior "uniquely sweeping" categorical ban on anybody (except for police, etc.) possessing a firearm in public did not comport with the Second Amendment. *Id.* at 942. While the Court remarked that "self-defense" (not "the right to bear arms," as plaintiffs claim) is "as important outside the home as inside," it also understood that "the need for defense of self, family, and property is most acute in the home." *Id.* at 935-36. The Seventh Circuit did not hold, or even suggest, that carrying a firearm outside the home is a "core" Second Amendment right.

Rather, in *Moore*, the Seventh Circuit allowed Illinois to craft a gun law that "impose[s] reasonable limitations, consistent with public safety and the Second Amendment" on carrying guns in public, *id.* at 942, a formulation consistent with intermediate scrutiny. *See also Culp*, 921 F.3d at 654 (*Moore* "went the added step of reiterating the assurances from *Heller* and *McDonald* that the rights conferred by the Second Amendment are not unlimited"). As the Seventh Circuit explained more recently in *Culp v. Raoul*, 921 F.3d 646, 654 (7th Cir. 2019), "the absence of historical support for a broad, unfettered right to carry a gun in public brings with it a legal

4

consequence: the Second Amendment allows Illinois, in the name of important and substantial policy interests, to restrict to the public carrying of firearms by those most likely to misuse them." *Id.*; *see also Kuck v. Danaher*, 822 F. Supp. 2d 109, 127 (D. Conn. 2011) ("The Court is persuaded by the reasoning of other courts that strict scrutiny should not apply to firearm regulations that restrict the right to bear arms outside the home.").

Plaintiff's reliance on *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) is also misplaced. (Dkt. No. 23 at 4) There, the plaintiffs challenged a City of Chicago ordinance that banned all firing ranges in the city, while at the same time mandating one hour of range training as a prerequisite to lawful gun ownership. *Id.* at 689-90. The Seventh Circuit applied a higher standard than intermediate scrutiny ("if not quite 'strict scrutiny'") because the challenged ordinance was a prohibition and "not merely regulatory," encompassed "law abiding, responsible citizens," and worked a "serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708. None of these factors are present here. First, the State's concealed carry regulations are regulatory. Second, the provisions of the Act at issue here require denial of a license only for persons about whom law enforcement has registered formal concerns and whom an expert body has determined likely to be dangerous. Third, this case involves concealed carry in public, and does not implicate the core Second Amendment right to keep and bear arms inside the home. Intermediate scrutiny applies.

Turning to the merits, plaintiffs cannot state a claim based on their allegations that the Act's dangerousness standard gives the Board "unbridled discretion" in violation of the Second Amendment. (Dkt. No. 15 at 7-12) In his response, White argues that only "objective" criteria for assessing dangerousness are constitutionally permissible. (Dkt. No. 23 at 7-9) He states that

Section 25 of the Act, 430 ILCS 66/25, which sets out six objective qualifications for a license, including that the applicant holds a valid FOID Card and does not have certain types of convictions, "comports to the letter and spirt of *Heller*, *McDonald*, and *Moore*." (*Id.* at 8) But he argues that the Act runs afoul of the Second Amendment to the extent that it allows the Board to "subjectively" evaluate persons who meet the requirements of Section 25 to determine, in accordance with Section 10 of the Act, 430 ILCS 66/10, whether they pose a danger to themselves or the public. (*Id.* at 8-9) White maintains, incorrectly, that persons who meet the requirements of Section 10 are necessarily "law abiding," and should be granted a license without any separate dangerousness assessment. (*Id.*)

This is not how the Act operates,[1] nor is such a rigid system required by the Second Amendment. The Seventh Circuit has already rejected an argument that FOID Card holders should not have to apply for a separate concealed carry license, explaining that "the different degrees of danger posed by possessing a weapon at home (the basic license) and carrying a loaded weapon in public (the concealed-carry license) justify different systems." *See Berron*, 825 F.3d at 847. For purposes of concealed carry in public, with all its attendant risks, the Board must be afforded *some* discretion in assessing dangerousness because "it is impossible for the legislature to conceive in advance each and every circumstance in which a person could pose an unacceptable danger to the public if entrusted with a firearm." (Dkt. No. 15 at 11, quoting *Kuck*, 822 F. Supp. 2d at 129) A number of states have firearms licensing regimes that confer some discretion on the licensing authority to assess an applicant's dangerousness, see *Hightower v. City of Boston*, 693 F.3d 61, 79

---

[1] White previously argued that there is conflict between Sections 10 and 25 of the Act. *See White*, 2017 WL 2602637, at *6. The Illinois Appellate Court rejected this argument, holding that the Act permits the Board to consider an applicant's entire criminal history. *Id.* An applicant who possesses a FOID Card may still have a criminal history that supports a finding that he poses a "danger" such that he should not be allowed to carry a weapon in public. *Id.* at *8.

n.16 (1st Cir. 2012) (listing states with a "suitable person" requirement), and this is permitted under the Second Amendment. *See Kuck*, 822 F. Supp. 2d at 129.

Moreover, contrary to plaintiffs' assertion, the Board's discretion is not "unbridled." It is cabined in at least five different ways, including administrative review, as set out in defendants brief. (Dkt. No. 15 at 8-9) Plaintiffs respond that the Second Amendment bars the Board from even *considering* certain information in assessing dangerousness (Dkt. No. 23 at 9-13, 14-16), and that the Board's exercise of discretion is effectively "unreviewable" because the Board is not required to make and publish "any particular findings and conclusions, other than the ultimate conclusion that the applicant poses a threat or danger" (*id.* at 14). Both concerns are misplaced, as discussed in Part IV below. Finally, plaintiffs do not respond to defendants' argument that their "unbridled discretion" argument fails to the extent that they are trying to import the First Amendment prior restraint doctrine to the Second Amendment (Dkt. No. 15 at 11-12), thus conceding defendants' point.

### **Plaintiffs' Due Process Claim Fails**

Plaintiffs' due process claim based on the Act's "dangerousness" standard also should be dismissed. (Dkt. No. 15 at 12-13) In his response, White relies heavily on *In re Torski C.*, 395 Ill.App.3d 1010 (4th Dist. 2009), an inapposite state court decision. (Dkt. No. 23 at 19) The court in *In re Torski C.* did find a definition of "dangerous conduct" in the Mental Health and Developmental Disabilities Code to be void for vagueness. 395 Ill.App.3d at 1012. But the court's concern there was not with the word "dangerous" but with the expressions "threatening behavior" and "conduct that places another individual in reasonable expectation of being harmed," which were used to define "dangerous conduct." *Id.* at 1024. The court was worried that "harm" might be construed as embracing psychological, emotional, and financial, as well as physical, harms, and

7

that mentally ill persons might be involuntarily confined for "engaging in merely usual or annoying behavior." *Id.* at 1025.

No prospect of such a misconstruction appears in this case because the standard is interpreted in terms of its statutory context. *See Grayned v. City of Rockford*, 408 U.S. 104, 111-12 (1972) (construing breach-of-peace ordinance in terms of its statutory context). As defendants noted in their opening brief, in the context of the Act, any reasonable person would understand that the "danger" referenced in the Act is the danger of the applicant or someone else getting shot through the applicant's intentional or reckless conduct while carrying a loaded firearm in public. (Dkt. No. 15 at 13) Likewise, any reasonable person would understand that the more indications of violence an applicant has in his history (or the more factors that might compromise his judgment, such as mental health or drug problems), the more likely he will be deemed dangerous within the meaning of the Act. (*Id.*)

Plaintiff argues that the Act violates due process because an applicant for a concealed carry license "cannot know from reading the Act" whether certain arrests and convictions will result in the denial of a license. (Dkt. No. 23 at 19) But due process does not require the removal of all uncertainty as to the result of an agency determination. (Dkt. No. 15 at 13-14) White cites to *Smith v. Goguen*, 415 U.S. 566 (1974), which is easily distinguishable and does not support his position here. In *Smith*, the Supreme Court held that a Massachusetts criminal statute providing for a fine or imprisonment for treating the flag "contemptuously" was unconstitutionally vague. *Id.* at 568-59, 582. The statute imposed criminal penalties, could reach protected First Amendment expression (meaning that greater specificity was required), and had not been subject to judicial clarification. *Id.* at 573. The Court emphasized the existence of "widely varying attitudes and tastes" for displaying the flag ("what is contemptuous to one man may be a work of art to another")

and noted that nothing prevented the Massachusetts legislature from defining the forbidden conduct with greater specificity. *Id.* at 581-82.

The situation here is far different. Plaintiffs' concern here is that they cannot predict whether an applicant will get a license, which is not the same as being unable to predict whether certain conduct (in particular, expressive conduct potentially protected by the First Amendment) will subject oneself to criminal prosecution and possible imprisonment. Further, the meaning of "danger," for purposes of assessing whether someone should be allowed to carry a gun in public, is not subject to the same sort of "widely varying attitudes and tastes" that persons have regarding treatment of the flag (especially where, as here, "danger" is construed by an expert body with a background in law enforcement and other relevant areas, see Dkt. No. 15 at 9. n.1). Finally, the Court in *Smith* expressly recognized that there are "areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision." 415 U.S. at 581. Concealed carry is one such area. "The factors which would make a person unsuitable [to carry a firearm] are many and evanescent," *Kuck*, 822 F. Supp. 2d at 134, and allowing a dangerous person to carry a concealed weapon in public can have deadly consequences. The Act's dangerousness standard falls into the category of an "imprecise but comprehensible normative standard," which the Supreme Court has deemed permissible. *See City of Chicago v. Morales*, 527 U.S. 41, 60 (1999).

Plaintiffs' remaining arguments are equally unavailing. Plaintiffs complain that applicants do not have an automatic right to an evidentiary hearing. (Dkt. No. 23 at 19-20) It is hard to see what this has to do with plaintiffs' vagueness claim, but regardless, their concern is unfounded. Applicants for a concealed carry license are allowed to respond to objections in writing, and the Board may call an in-person hearing when the issues "cannot be resolved to the [Board's]

9

satisfaction through written communication with the parties." 20 Ill. Admin. Code 2900.140(c). In connection with his first concealed carry application, the Illinois Appellate Court rejected White's argument that the Board's allegedly "unbounded" power to call a hearing violates due process, noting that "an administrative proceeding need not involve a hearing in order to comport with due process." *White*, 2017 WL 2602637, at *8; *see also Cleveland Bd. v. Loudermill*, 470 U.S. 532, 546 (1985) (noting that the fundamental due process requirements are notice and an opportunity to respond "either in person or in writing").[2] Plaintiffs also reiterate their argument that the Board's findings lack the requisite specificity (Dkt. No. 23 at 21-22); this argument, which is also disconnected from plaintiffs' vagueness claim, is addressed in Part IV below. Finally, plaintiffs express their disagreement with *Kuck*, holding that Connecticut's "suitability" standard for a pistol permit was not unconstitutionally vague (Dkt. No. 23 at 20), but the court's opinion is thorough and carefully-reasoned, and further confirms that plaintiffs' vagueness claim here should be dismissed. (Dkt. No. 15 at 14)

### III. THE ACT'S PREPONDERANCE OF THE EVIDENCE STANDARD FOR ASSESSING DANGEROUSNESS IS CONSTITUTIONAL.

Plaintiffs' challenge to the Act's "preponderance of evidence," standard for assessing dangerousness, 430 ILCS 66/20(g), also fails. (Dkt. No. 15 at 14-15) Plaintiffs assert that a "clear and convincing" standard of proof is constitutionally-mandated (Dkt. No. 23 at 22-23), but their position is foreclosed by binding Seventh Circuit precedent, which they do not address in their response. In *Berron*, a case that plaintiffs ignore, the Seventh Circuit upheld the Act's preponderance standard, noting that it is the norm in civil litigation and that it is not altered by the Second Amendment. (Dkt. No. 15 at 14, citing 825 F.3d at 848)

---

[2] For this reason, res judicata should apply here too. *See* Dkt. No. 15 at 6-7 and Part II above.

Plaintiffs also cite two due process cases, *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (termination of parental rights), and *Addington v. State of Texas*, 441 U.S. 418, 433 (1979) (indefinite and involuntary commitment to state mental hospital), for the proposition that, when a "fundamental" right is at issue, any adverse determination must be made by clear and convincing evidence. (Dkt. No. 23 at 22-23) They claim that these cases show that the clear-and-convincing-evidence standard is required when "'the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money.'" *Id*. at 23, quoting *Santosky*, 455 U.S. at 756. But *Santosky* also stated that the standard of proof for a particular issue should reflect the weight of the private and public interests affected and the societal judgment about how the risk of error should be allocated between the parties. *See* 455 U.S. at 755. The loss of the right to carry in public is nowhere near equivalent to the loss of a child or loss of freedom at issue in *Santosky* and *Addington*. Other authority shows that the clear-and-convincing-evidence standard is rare and is generally applied only when the State takes "unusual coercive action," such as termination of parental rights, involuntary commitment, deportation, or denaturalization. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989).

White's interest is not the only one at stake, and he is not being asked to bear a *greater* but only a nearly *equal* risk of error in the standard of proof. While an individual should not be asked to "share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state," *Addington*, 441 U.S. at 427, the converse is also true. Given the potentially deadly consequences of providing a concealed carry license to the wrong person, and the State's great interest in the safety of its citizens, it is not unfair to ask applicants for concealed carry licenses to bear a nearly equal risk of error. In the concealed carry context, an erroneous decision against an applicant does not mean a total deprivation of physical

liberty (as in *Addington*, 441 U.S. at 419-20), while an erroneous favor of an applicant means a dangerous individual walking around with the potential to take another's life with one pull of the trigger. In this situation, the preponderance of evidence standard is constitutional. *See Berron*, 825 F.3d at 848.

As Judge Zagel observed in *Moustakas v. Margolis*, application of the preponderance standard in the concealed carry context comports with the relevant Supreme Court case law on the standard of proof. *See* 154 F. Supp. 3d 719, 731 (N.D. Ill. 2016) (collecting cases). In their response (Dkt. No. 23 at 22-23), plaintiffs take issue with Judge Zagel's statement that examples of "unusual coercive action" warranting a heightened standard of proof have "involved the government taking away a right rather than declining to extend a right." 154 F. Supp. 3d at 731. Plaintiffs argue that the right to bear arms is an "inherent natural right" that is not "extended" by the Second Amendment, but rather "secured" by the Second Amendment, and, therefore, the Court in *Moustakas* "misapprehend[ed] the importance of the Second Amendment right to bear arms." (Dkt. No. 23 at 22-23) But nothing in *Moustakas* is inconsistent with the Seventh Circuit's concealed carry precedent, which holds that an individual's right to bear arms extends "at least to some degree" to the public carrying of firearms, *Culp v. Raoul*, 921 F.3d 646, 651 (7th Cir. 2019) and is subject to "reasonable limitations," *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Plaintiffs forget that the Seventh Circuit affirmed *Moustakas* itself, including the Court's holding that the preponderance of evidence standard may be applied to concealed carry applications. *See Berron*, 825 F.3d at 848.

**IV. THE ACT IS CONSTITUTIONAL IN THAT IT PERMITS THE BOARD TO CONSIDER ALL INFORMATION THAT LAW ENFORCEMENT DEEMS RELEVANT TO A PARTICULAR APPLICATION.**

Finally, plaintiffs' claims challenging the Board's ability to consider all information that law enforcement deems relevant to its objection to a concealed carry application should be dismissed. (Dkt. No. 15 at 15-19) In essence, plaintiffs claim that the Board—an expert body whose decisions are subject to administrative review—is constitutionally prohibited from *even considering* information that law enforcement deems relevant to a concealed carry application, when the consequences of allowing a dangerous person to carry a concealed weapon in public could be deadly. Such a positon is wholly untenable. Plaintiffs cannot state a Second Amendment claim: the Board's ability to review all information that law enforcement deems relevant to a particular application allows it to make a fully-informed decision regarding whether a particular applicant is too dangerous to be allowed to carry a firearm in public, and is therefore substantially related to the State's interest in safety. (Dkt. No. 15 at 17, citing *Culp*, 921 F.3d at 655) Likewise, plaintiffs cannot state a procedural due process claim, especially given that applicants have an opportunity to respond, the Board is an expert body, and the Board's decisions are subject to judicial review. (*Id.* at 18-19)

Far from supporting their claims, the facts of White's concealed carry application show precisely why the Board must be able to consider all information that law enforcement deems relevant when assessing an applicant's dangerousness. First, plaintiffs argue that old arrests should not be considered (Dkt. No. 23 at 9-10), but one of White's older arrests (in August 1998) was for having a loaded firearm in his vehicle, and White pled guilty. (Dkt. No. 15 at 4) Second, plaintiffs challenge the Board's consideration of "non-violent" arrests, but plaintiffs include possession of drugs (cannabis) and possession of a potential weapon (a folding pocket knife) in this category.

(Dkt. No. 23 at 10-12) Third, plaintiffs complain about the Board's consideration of "arrests when found not guilty," but as they admit, for White this included an arrest based on shooting a firearm in the air at a New Year's Eve party, which led to charges for reckless discharge of a firearm, felony possession of a firearm, and aggravated unlawful use of a weapon. (Dkt. No. 15 at 4)[3] Fourth, plaintiffs complain that the Chicago Police Department's objection to White's application stated that White was identified in its gang database as a member of the Latin Soul street gang. (Dkt. No. 23 at 15-17) In all of these cases, this is information that the Board might find relevant to assessing White's dangerousness. White had an opportunity to (and did) respond to these items, *see id.* at 15 and Dkt. No. 1 at ¶¶45-46 (detailing White's response to law enforcement's objection), and as an expert body, the Board was capable of deciding how much probative value to afford each piece of information (Dkt. No. 15 at 9 n.1).

The Board' ability to *consider* this information allows for fully-informed decision-making and is not constitutionally prohibited. (Dkt. No. 15 at 15-19) As plaintiffs admit, they do not know how much weight, if any, the Board gave to any particular item: "It is entirely rational, after reading the above, to ask 'how do you know the Board considered the cannabis arrest, the pocket knife arrest or any other arrest from 20 years ago.' The short answer is that we don't; and aye, there's the rub." (Dkt. No. 23 at 13; *see also id.* at 15 ("impossible to know" if Board relief on alleged gang affiliation), 21 ("we don't know" if Board relied on cannabis possession)) Thus, White suggests that his real concern is that the Board's decision on his second application lacked sufficient detail, precluding meaningful review. (Dkt. No. 23 at 13)

---

[3] While White was not convicted of these particular charges relating to the firing of a weapon at a New Year's Eve party, acquittal does not mean innocence, but rather that the prosecution could not prove guilt beyond a reasonable doubt. (Dkt. No. 15 at 16)

But there are multiple problems with this position, confirming that dismissal is appropriate. First, to the extent that White is claiming that the Board's decision in his case did not comport with the provisions of the Illinois Administrative Procedures Act, this Court is barred by the Eleventh Amendment from ordering defendants (state officials in their official capacities) to comply with state law. *See, e.g., Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 778 (7th Cir. 1991). Second, to the extent that White claims that the alleged lack of detailed findings denies him due process, he is simply wrong. "The statement of reasons [of an administrative agency's decision] need not include detailed findings of fact but must inform the petitioner of the grounds of decision and the essential facts upon which the administrative decision was based." *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996). Here, the Board made a specific factual finding that White was a danger to himself or others (Dkt. No. 1-4), and a reviewing court could examine the record to determine whether, under the applicable standard of review, the Board did not err in its finding. *See, e.g., Kimball Dawson, LLC v. City of Chicago Dep't Zoning*, 369 Ill. App. 3d 780, 786-87 (1st Dist. 2006). Third, if White believed that the Board's findings were inadequate, he should have pursued his remedies through administrative review in the state court system; the state court could have remanded for adequate findings. *See DeServi v. Bryant*, 2015 WL 3856109, at *3 (N.D. Ill. Jun. 19, 2015).

## **CONCLUSION**

For the foregoing reasons and those in defendants' memorandum in support of their motion to dismiss (Dkt. No. 15), plaintiffs' claims should be dismissed.

Dated: December 13, 2019

|  |  |
|---|---|
|  | Respectfully submitted, |
| KWAME RAOUL | |
| Attorney General of Illinois | /s/ *Michael T. Dierkes* |
|  | |
|  | Michael T. Dierkes |
|  | Office of the Illinois Attorney General |
|  | 100 West Randolph Street, 13th Floor |
|  | Chicago, Illinois 60601 |
|  | (312) 814-3672 |
|  | |
|  | Counsel for Defendants |