## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| MICHAEL WHITE and the ILLINOIS STATE RIFLE ASSOCIATION, | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | Case No. 19 C 2797 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| ILLINOIS STATE POLICE, ILLINOIS CONCEALED CARRY LICENSING REVIEW BOARD, BRENDAN KELLY, in his official capacity as Acting Director of the Illinois State Police, JESSICA TRAME, in her official capacity as Bureau Chief of the Illinois State Police Firearms Services Bureau, JEREMY MARGOLIS, as Chair of the Illinois Concealed Carry Licensing Review Board, EDWARD BOBRICK, STEPHEN DINWIDDIE, JOSEPH DUFFY, JON JOHNSON, JOSEPH VAUGHN and FRANK WRIGHT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Michael White and the Illinois State Rifle Association ("the ISRA") sue the Illinois State Police ("the ISP"), the Illinois Concealed Carry Licensing Review Board ("the Board"), and several individual members of both agencies under 42 U.S.C. § 1983, bringing both as-applied and facial constitutional challenges to Illinois' Firearm Concealed Carry Act, 430 Ill. Comp. Stat. 66/1 *et seq*. (the "FCCA"). Defendants move to dismiss. The motion is granted.[1]

---

[1] The court has jurisdiction under 28 U.S.C. §§ 1331 & 1343(a)(3) and venue is proper under 28 U.S.C. § 1391 because the events and omissions giving rise to plaintiffs' claims occurred in this district.

1

## BACKGROUND[2]

Illinois enacted the FCCA in the wake of *District of Columbia* v. *Heller*, 554 U.S. 570, 635, 128 S. Ct. 2783 (2008), which held that the Second Amendment guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," and *McDonald* v. *City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020 (2010), which held that right to be applicable against the states. Following those decisions, the Seventh Circuit held that the right to use firearms in self-defense extends beyond the home and, accordingly, struck down two Illinois statutes that generally prohibited carrying firearms in public. *Moore* v. *Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). The Illinois legislature passed the FCCA in response, creating a licensing system that authorizes the concealed carry of loaded firearms in public.[3] *See Berron* v. *Ill. Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 845 (7th Cir. 2016); *Culp* v. *Raoul*, 921 F.3d 646, 648 (7th Cir. 2019). The system is administered by the ISP, which the FCCA provides "shall issue" a concealed carry license to an applicant who meets certain statutorily enumerated qualifications,[4] submits required documentation and fees, and "does not pose a danger to himself, herself, or others, or a threat to public safety." 430 Ill. Comp. Stat. 66/10(a). It is that

---

[2] The following recitation of facts is taken from the well-pleaded allegations in plaintiffs' complaint, which are presumed true for purposes of this motion. *See Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

[3] Illinois still generally prohibits the open carry of ready-to-use firearms. *See* 724 Ill. Comp. Stat. 5/24-1(a).

[4] These include being at least 21 years of age, possessing an Illinois Firearm Owners' Identification Card, and not having been convicted of "a misdemeanor involving the use or threat of physical force or violence to any person within the 5 years preceding the date of the license application; or 2 or more violations related to driving while under the influence of alcohol, other drug or drugs, intoxicating compound or compounds, or any combination thereof, within the 5 years preceding the date of the license application." 430 Ill. Comp. Stat. 66/25.

last condition—which the court will refer to as the requirement that an applicant not be "dangerous"—that is at issue in this case.

To determine whether applicants are dangerous under the FCCA, the ISP enters their basic biographical information into a database accessible to Illinois law enforcement agencies. 430 Ill. Comp. Stat. 66/10(i). Those agencies may then review their records and object to an applicant's eligibility if they have a "reasonable suspicion" of dangerousness. 430 Ill. Comp. Stat. 66/15(a). The ISP refers any such objections to the Board, a seven-member body composed primarily of people with experience in federal law enforcement.[5] 430 Ill. Comp. Stat. 66/20(a); *see also* 20 Ill. Admin. Code §§ 1231.70(d), 1231.80(b). If the Board determines that an objection "appears sustainable," it sends the applicant "notice of the objection, including the basis for the objection and the [name of the] agency submitting the objection." 20 Ill. Admin. Code § 2900.140(e). Upon receipt of such notice, the applicant has fifteen days to submit a response. 20 Ill. Admin. Code § 2900.140(e)(1). The Board also has authority to request additional evidence of its own accord from the applicant, the objecting agency, or the ISP. 430 Ill. Comp. Stat. 66/20(e); 20 Ill. Admin. Code § 2900.140(b)-(c).

---

[5] The FCCA provides that the Board shall consist of:

(1)    one commissioner with at least 5 years of service as a federal judge;

(2)    2 commissioners with at least 5 years of experience serving as an attorney with the United States Department of Justice;

(3)    3 commissioners with at least 5 years of experience as a federal agent or employee with investigative experience or duties related to criminal justice under the United States Department of Justice, Drug Enforcement Administration, Department of Homeland Security, or Federal Bureau of Investigation; and

(4)    one member with at least 5 years of experience as a licensed physician or clinical psychologist with expertise in the diagnosis and treatment of mental illness.

430 Ill. Comp. Stat. 66/20(a); *see Berron*, 825 F.3d at 848.

After collecting evidence through that process, the Board is charged with determining, by "a preponderance of the evidence," whether the applicant is too dangerous to hold a concealed carry license. 430 Ill. Comp. Stat. 66/20(a) & (g). The Board's determination that an applicant is dangerous is conclusive of the administrative process, but a denied applicant may seek judicial review under the Illinois Administrative Review Law. 20 Ill. Admin. Code § 2900.160(e); 430 Ill. Comp. Stat. 66/87; *see also* 735 Ill. Comp. Stat. 5/3–101, *et seq.* Illinois courts review the Board's determination of dangerousness deferentially, overturning it only where it is "clearly erroneous." *White* v. *Illinois Dep't of State Police-Firearms Serv. Bureau*, No. 1-16-1282, 2017 WL 2602637, at *4 (Ill. App. Ct. June 14, 2017) (unpublished); *Perez* v. *Ill. Concealed Carry Licensing Review Bd.*, 63 N.E.3d 1046, 1052; 2016 IL App (1st) 152087, ¶ 22 (Ill. App. Ct. 2016); *see also* 735 Ill. Comp. Stat. 5/3–110 ("The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct").

## I.     White's First Application

White first applied for a concealed carry license on May 1, 2014. (Dkt. 1 ¶ 30.) The Chicago Police Department and Cook County Sheriff objected to his application on grounds that are described in the following letter White received from the Board:

> Based on your history & conduct reported by both the Chicago Police Department and the Cook County Sheriff's Office, the Board has preliminarily voted to sustain the objection to your receipt of a Concealed Carry License (CCL). Chicago PD lists you as a member of the Latin Souls Street Gang and Cook County reports you were arrested on 04/07/1995 for Battery with a knife, on 01/01/2012 for Unlawful Use of a weapon and reckless discharge and on 01/09/1996 for possession of a firearm in a vehicle. You now have 10 days from the date of this notice to submit any additional evidence for the Board to consider before the Board's vote is finalized and your application for a CCL is denied.

*White*, 2017 WL 2602637, at *1.[6] White submitted the following letter in response:

---

[6] The court describes and considers the facts set forth in the Illinois Appellate Court's opinion on the denial of White's first concealed carry application for the limited purpose of addressing defendants'

To whom it may concern,

I am not and never have been a member of any street gang.

I am not, never was and never will be affiliated with the Latin Souls street gang. I think because of the area I was arrested in, I was presumed to be a Latin Soul.

On the charge of 04/07/1995 (battery with a knife) I never battered anyone and the arresting officer declined to press charges and that case was dismissed.

On the charge of 01/09/1996 This must be a case of mistaken identity because I was never arrested or charged with any crime on that day or year. I can not attach anything to disprove this charge because I was never arrested on this date or year.

On 08/10/1998 I was arrested for (unlawful carry/possess firearm) this was a simple possession charge not in a commission of any crime. This charge was reduced to a misdemeanor on 08/10/2001 I have attached a PDF of the court records as proof.

On the charge of 01/01/2012 (UUW and reckless discharge) I was found not guilty of all charges and I have also attached a copy of the court records to prove this.

Just to recap I have met all the criteria to obtain a F.O.I.D. card.

I currently posses[s] one and have had no arrests since receiving the card. I've read all the requirements to obtain a CCL and meet them ALL. Therefore I don't understand why I can legally own a firearm but I have to go through all these hoops to carry one.

*Id.* at *1-2.

The ISP denied White's application in October 2014, stating that the Board had reviewed the evidence received and "determined, by a preponderance of the evidence, that the above referenced Applicant is a danger to him/herself, is a danger to others, or poses a threat to public safety." *Id.* at *2. White sought review of the denial in the Circuit Court of Cook County, which remanded the case to the Board for reconsideration based on post hoc changes to the FCCA's implementing regulations that afforded applicants the right described above to know "the basis"

---

*res judicata* arguments, as opposed to the issue of whether plaintiffs have stated claims on the merits. *See Ennenga* v. *Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012) (holding that courts may take judicial notice of "facts readily ascertainable from the public court record and not subject to reasonable dispute").

of any law enforcement agency objection, and the name of the objecting agency. *Id.;* 20 Ill.

Admin. Code § 2900.140(e).

On remand, the Chicago Police Department and the Cook County Sheriff again filed

objections to White's application, which the Board described as follows:

> The Chicago Police Department submitted an objection stating: Superintendent Garry F. McCarthy/Chicago Police Department object to the issuance of a concealed carry license to the applicant Michael White based upon a reasonable suspicion that the applicant is a danger to himself or others or a threat to public safety. The criminal activities of street gangs pose a substantial threat to the safety and quality of life of the residents of Chicago. In support of the objection, be advised that Chicago Police Department reports reflect the following: The applicant is listed in the CPD Gang Member Data Base [*sic*] as a member of The Latin Souls Street Gang.

> The Cook County Sheriff's Office submitted an objection stating: There is a reasonable suspicion that White is a danger to others and a threat to public safety. A search of CLEAR revealed that White was arrested for BATTERY/UUW KNIFE on 4/7/1995, UUW WEAPON FELON AND RECKLESS DISCHARGE on 1/1/2012 & POSSESSION FIREARM VEHICLE on 1/9/1996. A CLEAR search also revealed White as a Latin Soul Gang Member.

*Id.* at *2.

White submitted a written response and supporting affidavit on July 30, 2015, arguing

that "with only one arrest within 7 years of his application, [he] could not be deemed 'a danger to

himself or herself or others, or a threat to public safety.'" *Id.* He also argued that the FCCA's

dangerousness standard was unconstitutionally vague, its preponderance standard could not

withstand Second Amendment scrutiny, and that consideration of hearsay evidence regarding his

gang membership would violate his right to due process. *Id.*

The Board again denied White's application on dangerousness grounds. (Dkt. 1 ¶ 31.)

White again sought judicial review of the Board's decision, but the Circuit Court of Cook

County upheld it, the Illinois Appellate Court affirmed, and the Illinois Supreme Court denied

leave to appeal. (*Id.* ¶ 32); *see White,* 2017 WL 2602637, at *1, *petition for leave to appeal*

*denied*, 89 N.E.3d 764, 417 Ill. Dec. 845 (2017). White did not challenge those decisions in federal court.

## II.     White's Second Application

White submitted a second application for a concealed carry license on August 19, 2017. (Dkt. 1 ¶ 33.) The information in the record related to this second application is limited to the allegations in his complaint, a legal brief and affidavit he submitted to the Board, and the Board's ultimate denial letter. (Dkts. 1, 1-3, & 1-4.)

On October 25, 2017, the ISP informed White that the Chicago Police Department again objected to his application as follows:[7]

> CHICAGO POLICE DEPARTMENT: Officer Eric Gonzalez on behalf of Superintendent Eddie Johnson of the Chicago Police Department objects to the issuance of a concealed carry license to the applicant, Michael W. White, based on a reasonable suspicion that the applicant is a danger to himself or others or a threat to public safety. In support of the objection, be advised that the Justice Police Department reports reflect the following: 12-00001 reckless discharge of a firearm, in that on 01 JAN 2012, the applicant discharged multiple rounds from a gun into the air; the offender was arrested. The applicant is identified in the Chicago Police gang database as a member of the Latin Soul street gang. The criminal activities of street gangs pose a substantial threat to the safety and quality of life of the residents of Chicago… The Board is also requesting the following information from you: Information regarding the factual circumstances of your arrest(s) by the Chicago Police Department on or about the indicated date(s): 8/10/1998; 1/9/1996; 4/7/1995; 3/6/1994; 3/1/1994; 10/3/1993; 8/3/1993.

(Dkt. 1 ¶ 44.)

White again submitted a written brief and affidavit in response. (*Id.* ¶ 45; dkt. 1-3 at 19.) White's affidavit acknowledges that he was convicted of the following crimes:

- Unlawful use of a firearm in approximately 1998.[8] (Dkt. 1-3 at 22.) White states that he pleaded guilty to this crime after he was found in possession of a loaded firearm in

---

[7] The ISP's letter is not in the record before the court. This quotation is taken from White's complaint.

[8] The record is ambiguous as to the date White was convicted of this offense. White's affidavit provides only the date of his arrest: August 1998. (Dkt. 1-3 at 22.)

his vehicle. (*Id.*) He states that he had a valid FOID card at the time of the offense. (*Id.*)

- Possession of cannabis in 1994. (*Id.* at 23.)

He also acknowledges arrests for the following suspected conduct, some of which he

denies committing and some of which he admits, as described below:

- Reckless discharge of a firearm in January 2012. (*Id.* at 22.) White avers that he was at a New Year's Eve party where another man fired a gun into the air several times at midnight. (*Id.*) He avers that he went to trial on the charge and was acquitted. (*Id.*)

- Driving with a suspended license in 2001. (*Id.*) White avers that he was "cited" for this offense. (*Id.*)

- Disorderly conduct in 2000. (*Id.*) White avers that he does not remember this incident but remembers he "received no punishment" for it. (*Id.*)

- Unlawful use of a weapon in 1996. (*Id.* at 23.) White avers that he got into an argument with a man who was harassing his girlfriend. (*Id.*) Police intervened, arrested him, and found a folding pocketknife in his coat. (*Id.*) White avers that he did not take the knife out of his coat during the argument and that the arresting officer appeared in court but "chose not to continue with the charge." (*Id.*)

- An April 1995 arrest whose circumstances he does not recall. (*Id.*)

- Domestic battery in 1994. (*Id.*) He avers that he came home drunk one night, his mother asked him to leave, and she called the police when he refused. (*Id.*) He avers that he did not touch his mother during the incident but "was probably yelling." (*Id.*) His mother did not appear in court and the charge was dismissed. (*Id.*)

The Board again determined that White was a "danger to him/herself, is a danger to

others, or poses a threat to public safety," and the ISP denied his application. (*Id.* ¶ 47; dkt. 1-4 at

1-2.) White then brought the present suit, joined by the ISRA, against the ISP, the Board, and

several members thereof in their official capacities. Plaintiffs argue that the FCCA is

unconstitutional both as applied to White and on its face. Plaintiffs specifically make the

following arguments, each of which they assert constitutes a violation of both the Second

8

Amendment and the Fourteenth Amendment Due Process Clause: (1) the FCCA's dangerousness standard is overly vague and grants the Board "unfettered discretion"; (2) the FCCA's preponderance standard sets too low a bar; (3) the applicable level of constitutional scrutiny prohibits the Board from considering certain types of evidence in assessing dangerousness;[9] and (4) the cursoriness of the Board's written decisions prevent applicants from having a "meaningful right to review." (Dkt. 28; dkt. 1 ¶¶ 61, 65-72.) Defendants move to dismiss.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences therefrom in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011); *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010); *see also Johnson* v. *City of Shelby*, 574 U.S. 10, 135 S. Ct. 346 (2014) (per curiam) ("Federal pleading rules call for a short and plain statement of the claim showing the pleader is entitled to relief; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

---

[9] As discussed below, plaintiffs' brief abandons this argument as a Due Process challenge. (*See* dkt. 28 at 17–23.)

## ANALYSIS

### I.  The Eleventh Amendment Immunizes the ISP and the Board from Plaintiffs' Federal Claims

As an initial matter, plaintiffs concede that the ISP and the Board should be dismissed from this action, leaving only the individual defendants. (Dkt. 28 at 2 n. 1). The Eleventh Amendment bars federal claims against a state or its agencies unless the state consents or Congress has abrogated the state's immunity. *Pennhurst Sch. & Hosp.* v. *Halderman*, 465 U.S. 89, 97–102, 104 S. Ct. 900 (1984). The parties agree that the ISP and the Board are state agencies and that neither exception is present here. (Dkt. 28 at 2 n. 1). Thus, plaintiffs' claims against the ISP and the Board are dismissed. *See Eldridge* v. *Challenging Law Enforcement Official*, No. 17 C 4241, 2018 WL 1561729, at *2–3 (N.D. Ill. Mar. 30, 2018) (dismissing claims against the ISP and the Board on Eleventh Amendment grounds).

### II.  *Res Judicata* as to White's Facial Challenges

Defendants argue that White's facial challenges are barred by *res judicata* based on his prior Illinois lawsuit challenging the denial of his first concealed carry application. (Dkt. 15 at 6; dkt. 37 at 2.) In that lawsuit, as here, White argued that the FCCA's dangerousness and preponderance standards violate the Second Amendment and Due Process Clause. *White*, 2017 WL 2602637, at *4. White also contested the Board's consideration of arrests over ten years old and his inclusion in the CPD gang database. *Id.* at *3.

The Full Faith and Credit Act, 28 U.S.C. § 1738, "requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Walczak* v. *Chi. Bd. of Educ.*, 739 F.3d 1013, 1016 (7th Cir. 2014) (quoting *Kremer* v. *Chem. Constr. Corp.*, 456 U.S. 461, 466, 102 S. Ct. 1883 (1982)). Under Illinois law, the doctrine of claim preclusion bars a successive claim where

10

there exists: "(1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of the causes of action; and (3) an identity of parties or their privies." *Id.* (citing *Cooney* v. *Rossiter,* 986 N.E.2d 618, 621, 2012 IL 113227, ¶ 18 (Ill. 2012)). Claim preclusion applies not only to matters that were actually decided in the original action but also to matters that could have been decided. *Id.*

All three elements of claim preclusion are met here: final judgment was entered on White's Illinois lawsuit, it raised the same facial Second Amendment and Due Process challenges as his present suit, and it was litigated between the same parties (or their predecessors in office).[10] *See Jamaica Inn, Inc.* v. *Daley*, 381 N.E.2d 694, 696, 72 Ill. 2d 415, 420 (Ill. 1978) (holding *res judicata* barred a successive equal protection challenge to a Chicago anti-solicitation ordinance); *Pliska* v. *City of Stevens Point, Wis.*, 823 F.2d 1168, 1173 (7th Cir. 1987) ("Since all of the challenges to the facial validity of the ordinances were or could have been presented to the [Wisconsin] circuit court, the district court correctly found those claims barred by *res judicata*").

White effectively makes no argument that his facial challenges are not barred by *res judicata*, arguing only that his second application constitutes new grounds for a cause of action.[11] (Dkt. 28 at 24.) That is true with respect to his as-applied challenges—a point defendants do not

---

[10] To the extent White's facial challenges are more properly deemed legal "issues" as opposed to "claims," they are barred by the doctrine of issue preclusion. Illinois applies the doctrine of issue preclusion in similar circumstances as claim preclusion, with the relevant exceptions that "claim preclusion requires that the second suit advance a *cause of action* identical to that in the first suit, while issue preclusion requires that the *issues* presented be identical," and that the issues have been "actually litigated or determined" in the first suit. *Allison W.* v. *Oak Park & River Forest High Sch. Dist. #200*, 193 F. Supp. 3d 894, 898 (N.D. Ill. 2016) (emphasis original) (citing *Nowak* v. *St. Rita High Sch.*, 757 N.E.2d 471, 478, 197 Ill. 2d 381, 390 (Ill. 2001). White's facial challenges in the present suit are identical to the challenges that were actually litigated in his prior suit.

[11] The Supreme Court has held that facial *relief* in a successive constitutional challenge is not barred where it is appropriate relief for an as-applied claim. *Whole Woman's Health* v. *Hellerstedt*, -- U.S. --, 136 S. Ct. 2292, 2307 (2016), *as revised* (June 27, 2016). White makes no argument that *Whole Woman's Health* applies here.

contest—because such challenges target a law "in operation," limited to the specific facts of an individual case. *Berron*, 825 F.3d at 846; *see also Wash. State Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008). Facial challenges, in contrast, are not limited to the facts of a specific case and rather seek to "'establish that no set of circumstances exist under which [a law] would be valid,' i.e., that the law is unconstitutional in all its applications." *Wash. State Grange*, 552 U.S. at 449; *see also John Doe No. 1* v. *Reed*, 561 U.S. 186, 194, 130 S. Ct. 2811, 2817 (2010) (defining a facial challenge as one in which the claim and relief that would follow "reach beyond the particular circumstances of [the] plaintiffs"). White thus could have brought (and did in fact bring) all of his facial challenges in his first lawsuit.

### III.    The ISRA's Standing to Bring As-Applied Challenges

Defendants do not object to the ISRA's standing to bring as-applied challenges, but standing is a jurisdictional issue that the court has an obligation to consider *sua sponte*. *See Hay* v. *Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002). The ISRA invokes no basis to bring an as-applied challenge except as a representative of White: neither the complaint nor plaintiffs' joint response to the motion to dismiss refers to any other specific denial of a concealed-carry license. (*See, e.g.,* dkt. 1 ¶ 13; dkt. 28.) And the ISRA lacks standing to assert White's claim in a representative capacity when he is already asserting it himself. *See Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (organizational standing requires, among other things, that "neither the claim asserted nor the relief requested requires the participation of individual members in the association's lawsuit"). Thus the ISRA's as-applied claim is dismissed for lack of standing.

### IV.    Second Amendment Claims

Turning to the substance of the remaining Second Amendment claims—White's as-applied challenges and the ISRA's facial challenges—White's brief does little to differentiate his as-applied challenges from his facial challenges, generally casting all of his arguments as both. But most of White's arguments—that the Second Amendment prohibits the FCCA's grant of "unbridled discretion" to the Board, its use of the preponderance standard, and the Board's consideration of certain types of evidence—do not turn on the individual facts of his case. As-applied challenges to those aspects of the FCCA would argue that the Board misapplied its discretion and the preponderance standard, and gave undue weight to certain types of evidence. White's brief does not make those arguments. (*See* dkt. 28.)

But even if White's arguments are viewed as as-applied challenges that are not barred by res judicata, the court would dismiss them on the merits. The ISRA's arguments, which are identical to White's, fail for the same reasons.

The Seventh Circuit has prescribed a two-step process for assessing Second Amendment claims, beginning with "the threshold question of whether the restricted activity is protected by the Second Amendment." *Horsley* v. *Trame*, 808 F.3d 1126, 1129 (7th Cir. 2015); *see also Kanter* v. *Barr*, 919 F.3d 437, 441 (7th Cir. 2019). If the answer to that question is yes, the court evaluates "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Kanter*, 919 F.3d at 441. The rigor of the review "depend[s] on how close the law comes to the core of the Second Amendment rights and the severity of the law's burden on that right." *Id.* "Severe burdens on this core right require a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified." *Id.* at 441–42 (internal punctuation and citations omitted).

There is no question here that plaintiffs' claim satisfies the first step: the Seventh Circuit has held that the Second Amendment protects a right to carry firearms in public for self-defense. *Moore*, 702 F.3d at 942. The parties disagree, however, on the standard of scrutiny the court should apply at the second step. Plaintiffs argue that "near strict scrutiny" should apply, while defendants argue for intermediate scrutiny.[12] (Dkt. 28 at 4; dkt. 15 at 8.)

Whatever the practical difference between those two standards may be, there is no reason to choose between them because plaintiffs' challenge is foreclosed by the Seventh Circuit's decision in *Berron*. The court there expressly approved of section 66/20(g) of the FCCA, which renders an applicant ineligible "[i]f the Board determines by a preponderance of the evidence that the applicant poses a danger to himself or herself or others, or is a threat to public safety." *Berron*, 825 F.3d at 848. The court held that the Board's determination could constitutionally be determined by a preponderance of (as opposed to clear and convincing) evidence. *Id.* It did not address the statute's putative vagueness or its grant of "unbridled discretion," as plaintiffs argue here. *Id.* Nevertheless, by approving the preponderance standard the court implicitly decided that "danger to [one]self or others" can be so proven.

Even if the court did not interpret *Berron* as holding that the FCCA's dangerousness standard was appropriate under the Second Amendment, it would so hold on its own analysis. There can be no question that prohibiting truly dangerous people from carrying firearms in public is proper under the Second Amendment. *See Moore*, 702 F.3d at 940 (stating that the

---

[12] Plaintiffs concede, however, that the Seventh Circuit has "consistently described step two as 'akin to intermediate scrutiny' and ha[s] required the government to show that the challenged statute is substantially related to an important governmental objective." (Dkt. 28 at 5 (quoting *Kanter*, 919 F.3d at 442).) The Seventh Circuit also has stated that the government's interest "in keeping firearms away from persons, such as those convicted of serious crimes, who might be expected to misuse them" is an "important one." *Kanter*, 919 F.3d at 448; *see also Meza-Rodriguez*, 798 F.3d at 673 ("[T]he government has a strong interest in preventing people who already have disrespected the law… from possessing guns").

government is under no obligation to present empirical evidence to justify a law restricting Second Amendment activity where it "is limited to obviously dangerous persons"); *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns"). Plaintiffs propose no narrower language than the FCCA's dangerousness standard that would enable Illinois to effectuate that goal.

It is true, as plaintiffs argue, that "dangerousness" is a broad concept, but granting discretion to licensing authorities to assess dangerousness in individual cases is both necessary and desirable because "it is impossible for the legislature to conceive in advance each and every circumstance in which a person could pose an unacceptable danger to the public if entrusted with a firearm." *Kuck* v. *Danaher*, 822 F. Supp. 109, 129 (D. Conn. 2011); *see also Jankovich* v. *Ill. State Police*, 2017 IL App (1st) 160706, ¶ 71, 78 N.E.3d 548, 561 (upholding the FCCA's dangerousness standard over a vagueness challenge). And the meaning of dangerousness under the FCCA may be fleshed out through judicial review of individual cases, as it is for numerous other legal concepts that bear on constitutional rights. *See, e.g., Ornelas* v. *United States*, 517 U.S. 690, 697, 116 S. Ct. 1657, 1661 (1996) ("the legal rules for probable cause and reasonable suspicion acquire content only through application").[13]

*Berron* also forecloses plaintiffs' challenge to the evidence the Board considered, including White's old arrests and his inclusion in the Chicago Police Department's "gang database." Plaintiffs essentially argue that Second Amendment scrutiny applies to the Board's

---

[13] Furthermore, *contra* plaintiffs' view, the difficulty in determining who is actually too dangerous to carry a loaded gun in public actually counsels against recognizing a Second Amendment right to public carry for all putatively non-dangerous people, rather than concluding that legislative restrictions on public carry must be drawn with even greater precision.

(alleged) decision to consider each of these types of evidence. But as discussed above, *Berron* held that the Second Amendment does not require a finding of dangerousness to be based on a standard higher than the preponderance of the evidence, and it would flout that principle to conclude that individual steps in the Board's reasoning process are subject to heightened scrutiny. Certainly, plaintiffs cite no case holding that the Second Amendment imposes categorical restrictions on the types of evidence the government may consider in determining whether a person is qualified to carry a gun in public.[14]

Plaintiffs offer no argument related to *Berron*: their brief inexcusably fails to even mention that opinion, despite the fact that defendants identified it as "controlling precedent" in their motion to dismiss. (Dkt. 15 at 14; dkt. 28.)

### A.    White's Entitlement to a License

As discussed above, White's purported as-applied Second Amendment challenges primarily argue that various aspects of the FCCA and the Board's decision-making process are categorically unconstitutional as opposed to arguing that he personally is entitled to a concealed carry license, which is a largely distinct issue. White's complaint, however, seeks an injunction ordering the ISP to grant him a license, so for completeness the court will address whether such an injunction should issue. The Seventh Circuit has held that plaintiffs bear the burden of

---

[14] From a due process perspective, the Board is prohibited from making decisions that are "arbitrary" or "irrational." *Coniston Corp.* v. *Vill. of Hoffman Estates*, 844 F.2d 461, 468 (7th Cir. 1988). Plaintiffs do not argue that the Board's consideration of the types of evidence listed above fits that definition. Courts regularly consider arrests of all kinds—including old arrests and arrests for non-violent conduct— in assessing future dangerousness in criminal sentencing and related contexts, *see* 18 U.S.C. § 3553(a), and it is rational to do so. With respect to the Chicago Police Department's gang database, White presents compelling arguments that it is a deeply flawed tool, supported by a critical report from Chicago's Inspector General, but stops short of arguing that it would be irrational for the Board to consider it. (*See* dkt. 28 at 14-17.)

establishing their entitlement to a public carry license,[15] *Berron*, 825 F.3d at 848 ("Plaintiffs are the applicants for licenses, so they bear the burden of showing entitlement"), and the court here ultimately concludes that White has not carried that burden in either a legal or factual sense.

Establishing his entitlement to a license in this court would require White to (1) identify legal authority showing that individuals have a right to public carry that can overcome a state's determination of dangerousness; and (2) show how he falls within the scope of that right. In this regard, it is important to recognize that White is not invoking—and cannot invoke here—his putative entitlement to a concealed carry license under the FCCA, which grants Illinois residents who meet the threshold qualifications a presumptive right to a license unless the Board determines they are too dangerous to have one. The FCCA is an Illinois statute that this court has no jurisdiction to examine.[16] Rather, White's claim is a free-standing Second Amendment claim, which must rely on the scope of the right to public carry that Amendment provides.[17]

---

[15] As a general matter, the government bears the burden of establishing that laws that infringe on Second Amendment rights are constitutional. *See Hatfield* v. *Barr*, 925 F.3d 950, 953 (7th Cir. 2019); *Ezell* v. *City of Chicago*, 651 F.3d at 703 ("the answer to the Second Amendment 'infringement' question depends on the government's ability to satisfy whatever standard of means-end scrutiny is held to apply"). But the court understands the Seventh Circuit's statement in *Berron* as meaning the burden shifts to an applicant for a concealed carry license once a facially-valid licensing system is in place.

[16] White does not invoke this court's diversity or supplemental jurisdiction. (Dkt. 1 at 3.)

[17] This claim is unusual in that it is a challenge to an individual administrative decision, whereas all recent Seventh Circuit opinions of which this court is aware have involved challenges to the constitutionality of statutes or administrative rules, and seemingly have been written mostly with those broader types of challenges in mind. *E.g.*, *Kanter*, 919 F.3d at 442 ("We have consistently … required the government to show that the challenged *statute* is substantially related to an important governmental objective") (emphasis added). Nevertheless, *Heller*, of course, held that the Second Amendment guarantees an *individual* right and Seventh Circuit precedent indicates that individual challenges to denials of a concealed carry license may be brought immediately in federal court. *Berron*, 825 F.3d at 846 (exercising jurisdiction over claims brought in federal court immediately following denial of a license); *see also Horsley,* 808 F.3d at 1129 (holding that plaintiff need not exhaust state judicial remedies before challenging denial of a FOID license). Defendants do not argue otherwise.

White's brief scarcely addresses what the scope of the right to public carry is, however. To the extent he does, he seems to argue that the Board's individual licensing decisions are subject to heightened constitutional scrutiny and/or that the Second Amendment guarantees a right to public carry to people who are not dangerous, as ultimately determined through judicial review. (*See* dkt. 28 at 7 (stating defendants must "come forth with evidence that the burdens of the Act, as written and applied, have a 'close fit' to a 'strong public interest'"); dkt. 1 ¶ 49 ("White is not a danger to himself or the community").) As explained above, *Berron* forecloses the former view, since the Seventh Circuit there upheld the FCCA's preponderance standard. *Berron*, 825 F.3d at 848. And White cites no legal authority in support of the latter view, rather seemingly assuming that the lower bound of the Second Amendment's protection is coterminous with the right guaranteed by the FCCA.

The Seventh Circuit has made clear that dangerous people do not have a right to public carry, *see Moore*, 702 F.3d at 940; *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting), but it does not follow that all non-dangerous people do. To the contrary, the Seventh Circuit has upheld multiple categorical bans on the possession of guns (even within the home) by certain groups of people without regard to evidence that they personally might be responsible gun owners. Those groups include non-violent felons, *Kanter*, 919 F.3d at 447 (upholding 18 U.S.C. § 922(g)(1)); misdemeanants convicted of domestic battery,[18] *United States* v. *Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) (en banc) (upholding 18 U.S.C. § 922(g)(9)); unauthorized immigrants, *United States* v. *Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015) (upholding 18 U.S.C. § 922(g)(5)); and habitual drug users. *United States* v. *Yancey*, 621 F.3d 681, 682 (7th Cir. 2010) (upholding 18

---

[18] The court in *Skoien* expressly reserved the question "[w]hether a misdemeanant who has been law abiding for an extended period must be allowed to carry guns again." *Skoien*, 614 F.3d at 645.

U.S.C. § 922(g)(3)); *see generally* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1493–1515 (2009) (discussing bans on who may possess a gun); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 728–35 (2009).

There are several formulations of the Second Amendment right to carry arms in public that would exclude some people who are not dangerous.[19] To discuss a few: the Seventh Circuit has expressly reserved the question whether Second Amendment rights may be limited to so-called "virtuous" people, in some meaning of that term. *Kanter*, 919 F.3d at 451 (discussing the "difficult issue" of whether the "founders were really just concerned about dangerousness, not a lack of virtue"); *see also Yancey*, 621 F.3d at 684–85 ("most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens,' including felons"). The Seventh Circuit also suggested in *Berron* that Second Amendment rights might be reserved to "law-abiding, responsible citizens."[20] *Berron*, 825 F.3d at 847 ("When holding in [*Heller*] that the Second Amendment establishes personal rights, the Court observed that only law-abiding

---

[19] As a general matter, the Supreme Court instructed in *Heller* and *McDonald* that the scope of Second Amendment rights should be determined by textual and historical inquiry, rather than "judicial interest balancing." *McDonald*, 561 U.S. at 785; *see also Ezell*, 651 F.3d at 702; *Kanter*, 919 F.3d at 441. The parties do not, however, treat the court to an historical exegesis of the right to public carry at the founding, or at later dates at which Second Amendment rights might be seen to have been secured to people of all races and genders. It bears mention, however, that the Supreme Court in *Heller* stated that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626; *see also United States* v. *Adams*, 914 F.3d 602, 606 (8th Cir. 2019); *Peruta* v. *Cty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc); *cert. denied*, -- U.S. --, 137 S. Ct. 1995 (2017).

[20] The Seventh Circuit subsequently cited this statement from *Berron* disapprovingly, however. *Kanter*, 919 F.3d at 445 (noting that "some of *Heller*'s language does link Second Amendment rights with the notion of 'law-abiding citizens,'" but stating "we have refused to read too much into the Court's precautionary language").

persons enjoy these rights, even at home"). Either formulation might exclude White, who has two criminal convictions. And the Seventh Circuit has not addressed a question that has divided the other Courts of Appeals: whether the right to public carry may be conditioned upon showing a need for self-defense greater than that of the general public. *See Kachalsky* v. *Cty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012) (yes)[21]; *Woollard* v. *Gallagher*, 712 F.3d 865, 868 (4th Cir. 2013) (yes); *Wrenn* v. *District of Columbia.*, 864 F.3d 650, 655 (D.C. Cir. 2017) (no); *Young* v. *Hawaii*, 896 F.3d 1044, 1070 (9th Cir. 2018) (no), *pet. for reh'g en banc granted,* 915 F.3d 681 (9th Cir. 2019). White makes no such showing here.

But assume for the sake of argument that the Second Amendment guarantees a right to public carry to all non-dangerous people. White's complaint and brief do not take seriously the obligation to show he meets even that standard. The first sentence of White's brief asserts that he has been denied his Second Amendment rights because of old and unjustified arrests: "Michael White, a 43 year old man, has been twice denied a license to carry a concealed firearm because of arrests when he was 18 years old (1994) and 21 years old (1997), for alleged 'gang affiliation' he denies under oath—and which no agency could substantiate—and for an arrest in 2012, the charges on which he demanded trial and was found not guilty." (Dkt. 28 at 1 (edited for clarity).) White's brief goes on to discuss his "arrests" repeatedly. (*Id.* at 8, 9, 10, 12, 13.)

Nowhere, however, does his brief acknowledge that he was convicted of unlawful use of a firearm in 1998. (Dkt. 1-3 at 22.) True, that conviction occurred more than twenty years ago, when he was a young man, but unauthorized use of a firearm is precisely the type of conduct that raises concerns about a person's suitability to carry weapons in public. And if a single conviction

---

[21] The Seventh Circuit in *Moore* expressed "reservation" with *Kachalsky*'s "suggestion that the Second Amendment should have much greater scope inside the home than outside simply because other provisions of the Constitution have been held to make that distinction" *Moore*, 702 F.3d at 941.

for a non-violent felony or misdemeanor domestic battery can indefinitely disqualify a person from possessing a gun even in the home, it is not unreasonable to think that a single misdemeanor conviction for unlawful use of a firearm (setting aside the rest of White's criminal background) would indefinitely disqualify a person from carrying a loaded gun in public, where the danger of misuse is greater. *See Berron*, 825 F.3d at 847; *Moore*, 702 F.3d at 937. At a minimum, it is an issue White should have addressed. Indeed, White's brief repeatedly discusses an even older arrest for unlawful use of a weapon—from 1996, when he says he was arrested while carrying a pocketknife and faced charges that were later dismissed, (dkt. 28 at 9, 10, & 13)—making it difficult to see why he did not address his 1998 conviction.[22]

The Seventh Circuit in *Kanter* emphasized the difficulty of determining whether a person is too dangerous to carry a firearm, stating such determinations are "best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation." *Kanter*, 919 F.3d at 450. The court discussed the history of 18 U.S.C. § 925(c), which currently authorizes the Attorney General of the United States to restore firearm rights, on a case-by-case basis, to individuals subject to federal prohibitions, where they can establish they "will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Kanter*, 919 F.3d at 439. Since 1992, however, Congress has rendered that statute "inoperative" by barring the use of funds to effectuate it. *Id.* (quoting *Logan* v. *United States,* 552 U.S. 23, 28 n.1, 128 S. Ct. 475 (2007)).

---

[22] White also points out that Illinois has granted him a Firearm Owners Identification Card (which is generally required to possess a gun in the state, 430 Ill. Comp. Stat. 65/2(a)), which shows that the ISP does not take the position that he is a "clear and present danger to ... any other person." 430 Ill. Comp. Stat. 65/8(f); *see Rhein* v. *Coffman*, 825 F.3d 823, 824 (7th Cir. 2016). But there is no inconsistency between granting someone a FOID card and denying them a concealed carry license, given the different degrees of danger posed by possessing a weapon at home versus carrying one in public. *Berron*, 825 F.3d at 847.

Congress imposed the bar "after finding that the dangerousness inquiry was a 'very difficult' and time-intensive task, and that 'too many of [the] felons whose gun ownership rights were restored went on to commit violent crimes with firearms.'" *Id.* (quoting H.R. Rep. No. 102-618, at 14 (1992) & H.R. Rep. No. 104-183, at 15 (1995)).

Recognizing that the executive branch is best positioned to assess dangerousness, Illinois courts review the Board's determinations deferentially. *White*, 2017 WL 2602637, at *4; *Perez*, 63 N.E.3d at 1052. White's brief is ambiguous as to whether this court should apply the same deference.[23] (*See* dkt. 28 at 13.) But either approach presents a problem: not deferring to the Board would create a discrepancy between Illinois and federal law and thus a sharp comity issue. *See Courthouse News Serv.* v. *Brown*, 908 F.3d 1063, 1073 (7th Cir. 2018) (discussing "the deep[] principle of comity: the assumption that state courts are co-equal to the federal courts and are fully capable of respecting and protecting [a plaintiff's] First Amendment rights"). And it would allow federal judges to substitute their judgment for the Board's. On the other hand, the idea that the court should defer to the Board begs the question—which neither party considers— of what basis the court would have to do so: the Illinois Administrative Review Law, which provides that agency fact-finding "shall be held to be prima facie true and correct," 735 Ill. Comp. Stat. 5/3–110, does not apply here.

---

[23] In the course of arguing that there is no meaningful right to review the Board's decision, White states that "the Board's findings of fact are given deference" and should be reversed only "if they are against the manifest weight of the evidence." (Dkt. 28 at 13 (citing *Comprehensive Cmty. Solutions Inc.* v. *Rockford Sch. Dist. No. 205*, 873 N.E.2d 1, 10–11, 216 Ill. 2d 455, 471–72 (Ill. 2005)). Those statements are ambiguous as to whether White is describing Illinois procedure or advocating for the procedure this court should follow.

These are questions that White had an obligation to address but did not, electing instead to file an oversize brief that primarily sought to rehash issues conclusively decided by *Berron*.[24] It is not the court's role to make arguments on the parties' behalf. *See Anderson* v. *Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (courts should not "fill the void by crafting arguments and performing the necessary legal research").

### B. Meaningful Right to Review

White also challenges the sufficiency of the Board's stated reasons for denying his application, arguing that their cursoriness deprives him of a "meaningful right to review" under the Second Amendment and Due Process Clause. (Dkt. 28 at 13; *see also id.* at 23.) The Board's stated reasons appear to be boilerplate that essentially repeats the language of the dangerousness standard, 430 Ill. Comp. Stat. 66/10(a)(4), stating only that the Board "determined, by a preponderance of the evidence, that the above-referenced Applicant is a danger to him/herself, is a danger to others, or poses a threat to public safety." (Dkt. 1-4 at 2.)

In *Berron*, the Seventh Circuit warned that concealed carry applicants' rights could be violated if the Board were to write "unilluminating decisions," and specifically warned against "just repeating the language of 430 Ill. Comp. Stat. 66/10(a)(4)" in the context of explaining

---

[24] In addition, neither party addresses potential abstention or exhaustion issues posed by the availability of judicial review in Illinois state court. This court previously has held that the availability of such review following the ISP's procedure was sufficient process to protect a plaintiff's interest in a concealed carry permit, applying the balancing test prescribed by *Mathews* v. *Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893 (1976). *Moustakas* v. *Margolis*, 154 F. Supp. 3d 719, 730 (N.D. Ill. 2016), *aff'd on other grounds sub nom. Berron*, 825 F.3d at 843; *cf. Bolton* v. *Bryant*, 71 F. Supp. 3d 802, 812-13 (N.D. Ill. 2014) (holding plaintiff stated a due process claim under the pre-January 2015 FCCA regulations which did not afford applicants a right to know the contents of law enforcement objections). The sufficiency of such process is one factor weighing against making federal courts a jurisdiction of first review for all denials of a concealed carry permit. *See Courthouse News Serv.*, 908 F.3d at 1074 (discussing abstention principles in circumstances where state judicial remedies are available but have not been invoked).

what disclosure the Board must make of law enforcement objections. *Berron*, 825 F.3d at 846-47. The Board's decision here does exactly that.

In addition, while White does not raise this issue, the FCCA's implementing regulations provide that the Board Chairperson will write a "report" in each case it considers. 20 Ill. Admin. Code 1231.80(d) ("The Concealed Carry Licensing Review Board shall provide the [ISP] with its final decision on each applicant in an electronic report authored by the Chairperson of the Board"). It does not appear that such a report was written (or at least is not in the record before the court): the order of the Board that parrots the language of 430 Ill. Comp. Stat. 66/10(a)(4) is not a document one would typically call a "report," nor does the order indicate it was authored by the Board Chairperson. (Dkt. 1-4 at 2.)

Nevertheless, White's brief cites no case articulating a Second Amendment or Due Process right to a more detailed statement of reasons than what he was provided. He cites only Illinois cases addressing the Illinois Administrative Review Law, which is inapplicable here. (Dkt. 28 at 13 (citing *Comprehensive Cmty. Solutions Inc.*, 837 N.E.2d at 10–11, *Kouzoukas* v. *Retirement Bd.*, 917 N.E.2d 999, 234 Ill. 2d 446, 465 (Ill. 2009), & *Wade* v. *City of North Chicago*, 877 N.E.2d 1101, 226 Ill. 2d 485, 507 (Ill. 2007)). White also fails to address the fact that Illinois courts have repeatedly reviewed similar orders from the Board without remanding for a more detailed statement, *White*, 2017 WL 2602637, at *4; *Perez*, 63 N.E.3d at 1052, *Jankovich,* 78 N.E.3d at 555, which both suggests that they did not find the Board's orders to be lacking and demonstrates that the concept of dangerousness is being fleshed out through judicial review. Furthermore, in light of the court's holding above that White has not established his entitlement to a concealed carry license in this court, it is unclear what the benefit of ordering the Board to issue a more detailed statement of reasons would be.

Here, again, the court will not make White's arguments for him and deems this argument forfeited. *Jones* v. *Connors*, No. 11 CV 8276, 2012 WL 4361500, at *7 (N.D. Ill. Sept. 20, 2012) ("A party's failure to respond to arguments the opposing party makes in a motion to dismiss operates as a waiver or forfeiture of the claim and an abandonment of any argument against dismissing the claim.").

## V.     Due Process Claims

Finally, White contends that the arguments he advanced under the Second Amendment apply equally under the Due Process Clause.[25] (Dkt. 28 at 17–23.) But, again, the Seventh Circuit upheld the dangerousness and preponderance standards against Second Amendment challenges in *Berron*, 825 F.3d at 848. It would be strange for the court to have overlooked Due Process problems in doing so. And the Seventh Circuit also has rejected the argument that the Due Process Clause confers a substantive right to engage in the public carry of a firearm. *Culp*, 921 F.3d at 658. The court thus sees no reason why the Due Process Clause would affect the analysis above.

## CONCLUSION

Defendants' motion to dismiss is granted with prejudice. Judgment to follow.

Date: August 28, 2020

_____
U.S. District Judge Joan H. Lefkow

---

[25] More precisely, White's brief contains sections arguing the dangerousness standard is overly vague under Due Process precedent and the preponderance standard falls short of Due Process protections of fundamental rights. (Dkt. 28 at 17–23.) In the course of making those arguments, the brief also challenges the cursoriness of the Board's statement of reasons. (*Id.* at 21, 23.) The brief does not make arguments about the types of evidence the Board permissibly may consider under the Due Process Clause.